UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

DEC 2 1 2000

U.S. DISTRICT COURT

| | |
|---|---|
| JOSEPH WAYNE EASTRIDGE,<br>  Inmate #179-164<br>  2240 Hubbard Rd.<br>  Youngstown, OH 44505<br><br>MICHAEL A. DIAMEN, a/k/a<br>SALVATORE M. INFANTOLINO, AND<br>  3384 Coral Springs Drive<br>  Coral Springs, FL  33065<br><br>JOSEPH NICK SOUSA<br>  2111 Cowan Court<br>  Fredericksburg, VA 22401<br><br>        v.<br><br>UNITED STATES OF AMERICA | CASE NUMBER   1:00CV03045<br><br>JUDGE: Royce C. Lamberth<br><br>DECK TYPE: Habeas Corpus<br><br>DATE STAMP: 12/21/2000 |

## PETITION FOR HABEAS CORPUS

Andrew B. Weissman, Esq. (D.C. Bar No. 245720)
Sara E. Emley, Esq. (D.C. Bar No. 444965)
Jay V. Prabhu, Esq. (D.C. Bar No. 458428)
Clifton L. Brinson, Esq. (D.C. Bar No. 465178)
David J. Aveni, Esq. (D.C. Bar No. 467346)
WILMER, CUTLER & PICKERING
2445 M Street, N.W.
Washington, D.C.  20037-1420
(202) 663-6000

Counsel for Petitioners Joseph Wayne Eastridge and Joseph Nick Sousa

John Kenneth Zwerling, Esq. (D.C. Bar No. 147637)
ZWERLING & KEMLER, P.C.
108 N. Alfred Street
Alexandria, Virginia  22314
(703) 684-8000

Counsel for Petitioner Michael A. Diamen

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ........................................................................................ iv

STATEMENT OF THE CASE ...................................................................................... 2

CENTURION MINISTRIES' INVESTIGATION ........................................................ 5

SUMMARY ................................................................................................................ 6

STATEMENT OF FACTS ........................................................................................... 13

I.    FACTS ELICITED AT TRIAL ........................................................................... 13

      A.    Petitioners Were Not Identified as Participating in the Altercation with
            Battle and His Companions .................................................................... 13

      B.    None of the Petitioners Were Identified as Chasing Battle ...................... 15

      C.    The Victim's Blood Was Not Found on Petitioners ................................. 16

      D.    Petitioners Were Arrested Because of Their Association with Others ........ 18

      E.    The Damning Testimony of Dorothy Willetts ......................................... 19

II.   NEWLY DISCOVERED EVIDENCE OF PETITIONERS' INNOCENCE ............ 21

      A.    Recantation and Confession of Stephen Jones ........................................ 21

      B.    Testimony of Michael Grayson ............................................................... 23

      C.    Testimony of Raymond Thomas Lurz, Jr. ............................................... 24

      D.    Testimony of Richard Richter .................................................................. 25

      E.    Testimony of John Gianaris ..................................................................... 26

III.  NEW EVIDENCE OF WILLETTS' LIKELY PERJURY .................................... 28

      A.    Multiple Witnesses Testify That Petitioners Did Not Make the
            Inculpatory Statements Willetts Alleged at Trial ..................................... 28

      B.    Additional Witnesses Testify That Petitioners Did Not Make the
            Inculpatory Statements Willetts Alleged in Her Police Statement ............ 30

      C.    Evidence of Willetts' Lack of Credibility and Motive for Presenting
            False Testimony ..................................................................................... 32

ARGUMENT ............................................................................................................ 33

IV.    THIS COURT HAS JURISDICTION TO ENTERTAIN THE PETITION UNDER SECTION 2241 BECAUSE AS INTERPRETED BY THE D.C. COURT OF APPEALS SECTION 23-110 IS INADEQUATE OR INEFFECTIVE TO TEST THE LEGALITY OF PETITIONERS' DETENTION ......................................................................................................... 33

    A.    The D.C. Court of Appeals Rendered Section 23-110 Inadequate or Ineffective by Failing To Apply the Miscarriage of Justice Exception to Procedural Bars ....................................................................................... 34

        1.    According to the Miscarriage of Justice Exception, a Prisoner Who Raises Constitutional Claims and Supplements those Claims with a Showing of Actual Innocence May Have His Claims Heard on the Merits Despite Any Procedural Bars ..................... 34

        2.    The Petitioners Satisfied the Requirements of the Miscarriage of Justice Exception Set Forth in Schlup .................................................. 35

        3.    The D.C. Court of Appeals Failed To Apply the Miscarriage of Justice Exception to Petitioners' Motion ................................................ 37

        4.    The D.C. Court of Appeals' Failure To Apply the Miscarriage of Justice Exception to Petitioners' Motion Rendered Section 23-110 Inadequate or Ineffective ................................................................ 40

    B.    The Majority Rendered Section 23-110 Inadequate and Ineffective by Mischaracterizing Petitioners' 23-110 Motion as a Motion For a New Trial ........................................................................................................ 43

V.    THE COURT'S RULE PROHIBITING DEFENDANTS FROM ELICITING TESTIMONY THAT MIGHT IMPLICATE THEIR CODEFENDANTS VIOLATED PETITIONERS FIFTH AND SIXTH AMENDMENT RIGHTS .............. 45

    A.    The Court's Rule Impermissibly Limited Petitioners' Right To Confront and Cross-Examine Witnesses ............................................... 46

    B.    The Court's Rule Denied Petitioners' Sixth Amendment Right to Effective Assistance of Counsel ...................................................... 51

VI.    THE PROSECUTION'S USE OF PEREMPTORY CHALLENGES TO EXCLUDE WHITE JURORS FROM THE JURY VIOLATED PETITIONERS' FIFTH AMENDMENT RIGHT TO DUE PROCESS ......................... 54

VII.    THE PETITIONERS WERE DEPRIVED OF THEIR SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL ............................................. 57

A.    Petitioners' Counsel All Failed Effectively To Impeach Dorothy Willetts ............................................................................ 58

B.    Counsel for Eastridge Also Blotted Out His "Whiskey Bottle Defense" ............. 62

CONCLUSION ..................................................................................................... 64

CERTIFICATE OF SERVICE ............................................................................. 65

iii

## TABLE OF AUTHORITIES

### CASES

Page

Allen v. Hardy, 478 U.S. 255 (1986) ............................................................... 55

Angarano v. United States, 312 A.2d 295 (D.C. 1973) .............................................. 57

\* Batson v. Kentucky, 476 U.S. 79 (1986) ............................................................. 3, 54

Blair-Bey v. Quick, 151 F.3d 1036 (D.C. Cir. 1998) ................................................ 7

Bolling v. Sharpe, 347 U.S. 497 (1954) ............................................................ 54

Brown v. United States, 409 A.2d 1093 (D.C. 1979) ................................................. 46

Bruce v. United States, 379 F.2d 113 (D.C. Cir. 1967) .............................................. 57

Burks v. Dubois, 55 F.3d 712 (1st Cir. 1995) ...................................................... 44

Carriger v. Stewart, 132 F.3d 463 (9th Cir. 1997) .................................................. 44

Chambers v. Mississippi, 410 U.S. 284 (1972) ...................................................... 50

Christian v. United States, 394 A.2d 1 (D.C. 1978) ................................................. 52

Curry v. United States, 498 A.2d 534 (D.C. 1985) ................................................ 57, 58

Davis v. Alaska, 415 U.S. 308 (1974) .............................................................. 50

Davis v. United States, 417 U.S. 333 (1974) ....................................................... 41

Delaware v. Van Arsdall, 475 U.S. 673 (1986) ...................................................... 46

Desist v. United States, 394 U.S. 244 (1969) .................................................... 56, 57

Diamen v. United States, 444 U.S. 981 (1979) ....................................................... 2

Diamen v. United States, 725 A.2d 501 (D.C. 1999) ............................................. passim

Doepel v. United States, 434 A.2d 449 (D.C. 1981) .................................................. 3

Doepel v. United States, 510 A.2d 1044 (D.C. 1986) ................................................. 4

Douglas v. United States, 488 A.2d 121 (D.C. 1985) ................................................ 51

iv

Eastridge v. United States, 444 U.S. 981 (1979) ........................................................ 2

Elliott v. United States, 633 A.2d 27 (D.C. 1993) ..................................................... 46

Fitzgerald v. United States, 530 A.2d 1129 (D.C. 1987) ........................................... 52

Glasser v. United States, 315 U.S. 60 (1942) ............................................................ 51

Grayton v. United States, 745 A.2d 274 (D.C. 2000) ................................................ 46

Guinan v. United States, 6 F.3d 468 (E.D.N.Y. 1994) .............................................. 44

Harris v. United States, 441 A.2d 268 (D.C. 1982) ................................................... 59

Herrera v. Collins, 506 U.S. 390 (1993) ............................................................. 35, 43

Hill v. United States, 368 U.S. 424 (1962) ................................................................ 41

In re Winship, 397 U.S. 358 (1970) .......................................................................... 35

Johnson v. United States, 552 A.2d 513 (D.C. 1989) ................................................ 46

Johnson v. Zerbst, 304 U.S. 458 (1938) .................................................................... 55

Kaufman v. United States, 394 U.S. 217 (1969) ........................................................ 41

Kuhlmann v. Wilson, 477 U.S. 436 (1986) ................................................................ 35

Lawrence v. United States, 482 A.2d 374 (D.C. 1984) .............................................. 46

Miller v. United States, 479 A.2d 862 (D.C. 1984) ................................................... 58

Murray v. Carrier, 477 U.S. 478 (1986) .............................................................. 12, 55

Payne v. United States, 697 A.2d 1229 (D.C. 1997) .................................................. 57

Roviaro v. United States, 353 U.S. 53 (1957) ........................................................... 50

Sanders v. United States, 373 U.S. 1 (1963) ............................................................... 7

Sawyer v. Butler, 881 F.2d 1273 (5th Cir. 1989), aff'd sub nom. Sawyer v. Smith,
    497 U.S. 227 (1990) ............................................................................................. 57

Sawyer v. Smith, 497 U.S. 227 (1990) ...................................................................... 56

*   Schlup v. Delo, 513 U.S. 298 (1995) ....................................................... 5, 12, 33, 34, 35

Sousa v. United States, 400 A.2d 1036 (D.C. 1979) ............................................... 2, 40

Sousa v. United States, 444 U.S. 981 (1979) ...................................................... 2

\* Strickland v. Washington, 466 U.S. 668 (1984) ............................... 49, 51, 53, 57, 58

Swain v. Alabama, 380 U.S. 202 (1965), overruled by Batson v. Kentucky, 476
   U.S. 79 (1986) ............................................................................................. 3, 55

\* Swain v. Pressley, 430 U.S. 372 (1977) ...................................................... 33, 34, 41, 42

Teague v. Lane, 489 U.S. 288 (1989) ......................................................... 55, 56, 57

Triestman v. United States, 124 F.3d 361 (2d Cir. 1997) ...................................... 33

Turner v. United States, 459 A.2d 1054 (D.C. 1983) ........................................... 55

Tursio v. United States, 634 A.2d 1205 (D.C. 1993) ............................................ 54

United States v. Arcoren, No. CR 89-30049, 1999 WL 638244 (D.S.D. July 27,
   1999) ........................................................................................................ 39

United States v. Bolden, 514 F.2d 1301 (D.C. Cir. 1975) ...................................... 45

United States v. Dale, 1240 F.3d 1054 (D.C. Cir. 1998) ....................................... 44

United States v. DeCarlo, 848 F. Supp. 354 (E.D.N.Y. 1994) ................................ 44

United States v. Diamen, Cr. No. F-53485-75, slip op. at 15, 16 n.11 (D.C. Super.
   Ct. Aug. 20, 1984) ....................................................................................... 3

United States v. Eastridge, 110 Wash. L. Rep. 1181 (D.C. Cuper Ct. 1982) ...................... 2, 39, 49

United States v. Gambrill, 449 F.2d 1148 (D.C. Cir. 1971) .................................... 45

United States v. Leonard, 494 F.2d 955 (D.C. Cir. 1974) ...................................... 45

United States v. Nahodil, 36 F.3d 323 (3d Cir. 1994) .......................................... 41

United States v. Palumbo, 608 F.2d 529 (3d Cir. 1979) ........................................ 38

United States v. Roman, 938 F. Supp. 288 (E.D. Pa. 1996) .................................... 39

United States v. Wilson, 434 F.2d 494 (D.C. Cir. 1970) ........................................ 52

United States v. Zorilla, 924 F. Supp. 560 (S.D.N.Y. 1996) ................................... 39

Waldron v. United States, 370 A.2d 1372 (D.C. 1977) ................................................ 44

Williams v. United States, 374 A.2d 885 (D.C. 1977) ................................................ 44

Woody v. United States, 369 A.2d 592 (D.C. 1977) ................................................ 57

Zafiro v. United States, 506 U.S. 534 (1993) ................................................ 50

Zambrana v. United States, 790 F. Supp. 838 (N.D. Ind. 1992) ................................................ 41

Zanders v. United States, 678 A.2d 556 (D.C. 1996) ................................................ 57

## CONSITUTIONAL PROVISIONS

U.S. Const. amend. V ................................................ 12, 36, 43, 50

U.S. Const. amend. VI ................................................ 13, 36, 43, 50, 54

## STATUTES

28 U.S.C. § 2241 ................................................ 7, 33, 34, 44

28 U.S.C. § 2254 ................................................ 41, 42

28 U.S.C. § 2255 ................................................ 34, 41, 42, 44

D.C. Code Ann. § 16-1901 ................................................ 7

D.C. Code Ann. § 23-110 ................................................ passim

D.C. Code Ann. § 23-110(a) ................................................ 43

D.C. Code Ann. § 23-110(b) ................................................ 43

D.C. Code Ann. § 23-110(g) ................................................ 7, 33

## RULES

D.C. Super. Ct. Rules of Criminal Procedure, Rule 33 ................................................ 4, 38, 40, 44

## BOOKS AND ARTICLES

Bedau, Hugo Adam & Michael L. Radelet, Miscarriages of Justice in Potentially Capital Cases, 40 Stan. L. Rev. 21 (1987) ................................................ 1

Borchard, Edwin M., Convicting the Innocent, Errors of Criminal Justice (1932) ................................................ 1

Frank, Allan, 1 Killed, 1 Hurt in Street Fight, Wash. Star, Nov. 3, 1974, at B2 ................................................ 56

Green, Stephen, 4 Pagans Guilty in Man's Murder, Wash. Post, Jan. 7, 1976, at
 B1 .................................................................................................................. 56

Jeffries, John C., Jr. & William J. Stuntz, Ineffective Assistance and Procedural
 Default in Federal Habeas Corpus, 57 U. Chi. L. Rev. 679, 718 (1990) ............... 57

New York State Defenders Ass'n, Wrongful New York State Homicide
 Convictions Since 1965 (May 30, 1990) ................................................................ 1

Rippeteau, Jane & Deborah Sue Yaeger, Man Stabbed to Death, 4 Charged With
 Homicide, Wash. Post, Nov. 3, 1974, at B1 ......................................................... 56

Walker, Kenneth, Pagans Found Guilty of '74 Racial Slaying, Wash. Star, Jan. 7,
 1976, at B3 ........................................................................................................ 56

viii

## PETITION FOR HABEAS CORPUS

Petitioners Joseph Wayne Eastridge, Joseph Nick Sousa, and Michael Diamen ("Petitioners") file this Petition for habeas corpus to vacate their convictions for the 1974 murder of Johnnie Battle. In January 1976, Petitioners were convicted of stabbing Battle to death in a case tried to a jury before D.C. Superior Court Judge Moultrie. This Petition demonstrates that Petitioners are innocent of the murder of Battle — that they are among the small but unnerving number of innocent persons serving long terms of incarceration based upon convictions for crimes they did not commit.[1] This Petition also demonstrates that Petitioners were wrongfully convicted as a result of: (1) violation of their constitutional right to introduce evidence of their innocence, (2) use of race-based peremptory challenges by the prosecution in choosing a jury, and (3) ineffective assistance of defense counsel. Thus, this court should vacate Petitioners' convictions.

---

[1] See generally New York State Defenders Ass'n, Wrongful New York State Homicide Convictions Since 1965 (May 30, 1990) (documenting 59 homicide cases in New York state between 1965 and 1988, in which a defendant was wrongfully convicted of homicide); Hugo Adam Bedau & Michael L. Radelet, Miscarriages of Justice in Potentially Capital Cases, 40 Stan. L. Rev. 21 (1987) (documenting 350 potential capital cases involving wrongful convictions of innocent people between 1900 and 1985); Edwin M. Borchard, Convicting the Innocent, Errors of Criminal Justice (1932) (documenting 65 cases of defendants wrongfully convicted of murder and other serious felonies).

## STATEMENT OF THE CASE

In January 1976, Petitioners, together with their co-defendant Stephen Jones, were convicted of first degree murder while armed.[2] Petitioners each were sentenced to prison terms of 20 years to life.  Diamen and Sousa served 19 years in prison and are currently out on very restrictive parole, suffering from the severe stigma and disabilities of their convictions. Eastridge remains incarcerated today.  Jones, who was a juvenile at the time of Battle's death, served less than four years in prison and is free today.

All of the defendants appealed their convictions except Jones.  The District of Columbia Court of Appeals rejected all of Petitioners' arguments with almost no discussion.  Sousa v. United States, 400 A.2d 1036, 1038 (D.C. 1979).  The Supreme Court denied Petitioners' petitions for writ of certiorari.  Sousa v. United States, 444 U.S. 981 (1979); Diamen v. United States, 444 U.S. 981 (1979); Eastridge v. United States, 444 U.S. 981 (1979).

Sousa has never collaterally attacked his conviction.  In 1981, in a Motion For a New Trial filed in D.C. Superior Court, Eastridge alleged that he had been denied effective assistance of counsel and that newly discovered evidence exonerating him, consisting primarily of alleged statements by Stephen Jones, warranted the grant of a new trial.  Jones, however, had refused to sign an affidavit as to Eastridge's innocence.  The court denied Eastridge's motion without granting an evidentiary hearing, United States v. Eastridge, 110 Wash. L. Rep. 1181, 1187 (1982), and was affirmed on appeal.  Eastridge v. United States, No. 82-387 (D.C. June 16, 1983).

---

[2]     A fifth co-defendant, Richard Richter, was tried for assault with the Petitioners and Jones. He was convicted, but his conviction was later overturned by this the D.C. Court of Appeals. See Sousa v. United States, 400 A.2d 1036 (D.C. 1979).

2

Diamen brought a pro se Motion to Vacate Judgment and Sentence in D.C. Superior Court in September 1983 based on the government's use of peremptory challenges to strike every white juror from the panel, double jeopardy, incompetence of Petitioner to stand trial, ineffective assistance of counsel, and newly discovered evidence. The court denied Diamen's jury selection challenge without an evidentiary hearing based on tests courts were applying at the time, namely, those set out in Doepel v. United States, 434 A.2d 449, 458 (D.C. 1981), and Swain v. Alabama, 380 U.S. 202, 222 (1965). Batson v. Kentucky, 476 U.S. 79 (1986), had yet to be decided.

The court denied Diamen's newly discovered evidence challenge without an evidentiary hearing because "the alleged recantation of Stephen Jones [was] completely untrustworthy." Moreover, the court ruled that "petitioner can not assure the court that Jones would testify at a new trial." United States v. Diamen, Cr. No. F 53485-75, slip op. at 15, 16 n.11 (D.C. Super. Ct. Aug. 20, 1984). Jones had not yet agreed to execute an affidavit and his assertions were uncorroborated at the time. The court dismissed Diamen's other arguments as vague and conclusory. The District of Columbia Court of Appeals denied his motion for reconsideration. Diamen v. United States, No. 84-1358 (D.C. July 13, 1985).

In April 1995, Petitioners filed a joint Motion to Vacate Convictions and Request for Evidentiary Hearing in D.C. Superior Court under D.C. Code Ann. § 23-110. On the same day, Petitioners also filed a joint Motion for Disclosure of Grand Jury Testimony and Discovery. In February 1996, Judge John H. Suda denied all of Petitioners' Motions without a hearing.[3]

---

[3]    The court below conceded that it had to hear the merits of Petitioner Sousa's claim for relief under Section 23-110 of the D.C. Code and then applied its analysis to all three Petitioners. United States v. Eastridge, Nos. F-53482-75, F-53483-75, F-53485-75, Memorandum and Order at 12  (D.C. Super. Ct. filed Feb. 15, 1996). In light of the fact that the claims of Eastridge and Diamen are virtually identical to Sousa's claim, the court

A split panel of the D.C. Court of Appeals affirmed Judge Suda's decision in December 1997. Although the majority of the court concluded that the Petitioners "have presented a non-frivolous claim that they have spent many years behind bars for a crime that they did not commit," Diamen v. United States, 725 A.2d 501, 513 (D.C. 1999), the majority nonetheless held that Petitioners' 23-110 motion was properly denied for two reasons: First, the majority held that the motion was filed after the two-year time limit contained in Rule 33 had elapsed. According to the majority, although Petitioners had not filed their motion pursuant to Rule 33, the rule's time limit applied to Petitioners' 23-110 motion because the purpose of their motion was identical to that of a Rule 33 motion for new trial. The majority concluded that the two-year limit was an absolute bar; a court may not entertain new evidence of innocence after the two-year period elapses even if "the court is convinced that a grave miscarriage of justice has taken place." Id. at 506 (internal quotation and citation omitted).

Second, the majority concluded that Petitioners' motion was barred by res judicata because two of Petitioners' claims had been raised and rejected on direct appeal. See id. Although the majority recognized that an issue that has been decided on appeal may be reheard on collateral attack where "special circumstances" exist, see id. at 509 (quoting Doepel v. United States, 510 A.2d 1044, 1045-46 (D.C. 1986)), the majority rejected the notion that such special circumstances exist when the previously-decided issue involves a constitutional violation and the prisoner supplements that claim with a colorable showing of actual innocence based on newly discovered evidence. See id. at 512.

The majority's reasoning was harshly criticized in a dissenting opinion written by Judge Ruiz. First, Judge Ruiz concluded that Rule 33's two-year time limit does not apply to

---

properly exercised its discretion to address on the merits the claims of each of the Petitioners.

4

Petitioners' motion. Because Petitioners' motion is centered upon constitutional claims, she concluded, the motion was properly filed pursuant to Section 23-110, which has no time limit. See id. at 514-15.

Second, Judge Ruiz concluded that res judicata does not bar Petitioners' claims. Judge Ruiz pointed out that in Schlup v. Delo, 513 U.S. 298 (1995), the U.S. Supreme Court held that when a prisoner raises a constitutional claim supplemented by a colorable showing of factual innocence, his collateral attack should be entertained on the merits even though it otherwise would be procedurally barred. Judge Ruiz stated that this Schlup standard should constitute "special circumstances" by which a previously decided issue may be reheard on collateral attack. Because Petitioners satisfied this standard, she concluded, the majority improperly applied res judicata to their claims. According to Judge Ruiz, the majority's application of Section 23-110 "renders our habeas recourse under § 23-110 'inadequate' and 'ineffective' when compared with the availability of habeas review in federal courts." Diamen, 725 A.2d at 516 (Ruiz, J., dissenting).

Petitioners filed for rehearing en banc, which was denied in September 1999. See Diamen v. United States, Nos. 96-CO-295, -299, -301 (D.C. Sept. 17, 1999).

## CENTURION MINISTRIES' INVESTIGATION

Petitioners came to the attention of Centurion Ministries in 1987. See Affidavit of Kate Hill Germond ("Germond Aff.") ¶ 4 (Exhibit 2). Centurion Ministries is a nonprofit national advocacy center for the innocent in prison.[4]

---

[4]    Centurion Ministries' mission is "to free from prison and vindicate those who are completely innocent of the crimes for which they have been wrongfully convicted and sentenced to life or death." Affidavit of James McCloskey ¶ 4 ("McCloskey Aff.") (Exhibit 3).

"Centurion Ministries receives literally thousands of requests for aid from imprisoned persons." McCloskey Aff. ¶ 5 (Exhibit 3). Centurion Ministries reviews each request and undertakes to secure vindication only where careful, independent investigation shows that the imprisoned person did not commit the crime of which he was convicted. See id. Since 1983, Centurion Ministries has undertaken to vindicate only 56 convicted persons. Twenty-two of those individuals have been vindicated and freed to date, the most recent of whom was A.B. Butler, released from prison in January 2000. See id. ¶¶ 5-6. Twenty other investigations are ongoing. See id. ¶ 7.

Centurion Ministries has conducted an exhaustive eight-year investigation of the case against Petitioners. See Germond Aff. ¶¶ 4-5 (Exhibit 2). This investigation has yielded powerful evidence that Sousa, Eastridge, and Diamen are innocent and has identified the real killers. See id.

## SUMMARY

The new body of evidence uncovered by Centurion Ministries makes it clear that Petitioners are actually innocent of the murder of Johnnie Battle.[5] Particularly in light of demonstrable weaknesses in the original case made at trial, the new body of evidence makes it more likely than not that no reasonable juror would have convicted Petitioners in light of the new evidence. Yet although Petitioners are innocent of the crime for which they spent over twenty years in prison, they have never had the opportunity to have their constitutional claims addressed on the merits.

---

[5]    The new evidence proves that Petitioners played no role in Battle's murder; the evidence exonerates Petitioners not only of the actual stabbing, but also of aiding and abetting the real killers.

6

This court has jurisdiction to hear Petitioners' petition and should vacate their convictions. D.C. Code Ann.§ 23-110 vests the D.C. courts with exclusive jurisdiction to entertain habeas corpus petitions unless it "appears that the remedy by motion is inadequate or ineffective to test the legality of [the prisoner's] detention." D.C. Code Ann. § 23-110(g). In Petitioners' case, the D.C. Court of Appeals rendered Section 23-110 inadequate or ineffective to test the legality of Petitioners' detention by imposing procedural bars which prevented Petitioners from receiving a hearing on the merits of their claims even though they raised a number of constitutional claims and supplemented those claims with a colorable showing of actual innocence. Thus, this court has jurisdiction to hear this petition under 28 U.S.C. § 2241.[6] Cf. Sanders v. United States, 373 U.S. 1, 14-15 (1963) ("A prisoner barred by *res judicata* would seem as a consequence to have an 'inadequate or ineffective' remedy under § 2255 and thus be entitled to proceed in federal habeas.").

The totality of evidence now available makes the events of November 1, 1974 clear. On the evening of November 1, Petitioners joined a group of fellow Pagan Motorcycle Club members[7] and others in celebrating Richard Richter's birthday at Richter's home in Arlington,

---

[6]     Petitioners are not required to bring their motion under D.C. Code Ann. § 16-1901, the post conviction relief available to D.C. prisoners under the D.C. Code that mirrors 28 U.S.C. § 2241, because unlike Section 23-110,

> section 16-1901 does not bar the federal courts from entertaining habeas corpus petitions filed by D.C. prisoners under 28 U.S.C. § 2241. Sections 16-1901(b) and (c) only set forth the proper place in which to file those habeas corpus petitions that are brought pursuant to section 16-1901(a). They do not speak to the question of where persons may file habeas petitions that are brought under other sources of authority, such as section 2241.

Blair-Bey v. Quick, 151 F.3d 1036, 1043 (D.C. Cir. 1998).

[7]     At the time of the murder, Petitioners were all members of the Pagan Motorcycle Club, a motorcycle club based in the mid-Atlantic region. Diamen, age 26, was from Florida; Eastridge, age 28, and Sousa, age 26, were from Fredericksburg, Virginia. Eastridge and Sousa were both

Virginia. Petitioners and nine others[8] drove in two cars to the Godfather nightclub in the District of Columbia. When the group left the Godfather, there was an altercation between Richter and three black men, one of whom was the decedent, Johnnie Battle. After this altercation, Battle retrieved a handgun from his car and fired several shots into the group. Battle's shots hit and wounded Bruce Hunter. Battle's gun then jammed, and he ran off.

Five members of the group — Richter, Heim, Summers, Greenwood, and the wounded Hunter — immediately drove to Arlington County Hospital in one of the two cars. Four other members of the original group — Jones, Barber, Jennings and Woods — chased after Battle. They caught him several blocks later and viciously stabbed him to death.[9] The final three members of the group — Petitioners — did not participate in the chase or murder. Indeed, eyewitness descriptions of the clothing worn by the men participating in the chase did not match the clothing worn by Petitioners. Petitioners returned to the second car,[10] drove south on Wisconsin Avenue, and turned left on Emery Street where they saw Jones.[11] Jones, who had fled from the stabbing of Battle one block away on Ellicott Street, climbed into the back seat of the

veterans of the Vietnam war and held regular jobs (Sousa as a construction worker and Eastridge as a carpet layer); neither had a criminal record. Both Eastridge and Sousa had been members of the Pagan Motorcycle Club for less than one year. Diamen had joined the club in 1969.

[8]      Richard Richter, Chesley Barber, Charles Jennings, Stephen Jones, John Woods, Pamela Heim, Jill Summers, Tommy Greenwood, and Bruce Hunter.

[9]      Affidavit of Stephen Jones ¶¶ 4, 13 ("Jones Aff.") (Exhibit 4). In his affidavit, Jones confesses to being one of the four chasers/murderers, confirms that Petitioners were not among the four who attacked Battle and admits he gave false testimony during the original trial. See id. ¶ 4, 19-21; see also Affidavits of Michael Grayson, Raymond Thomas Lurz, Jr., and Richard Richter (Exhibits 5-7).

[10]      Eastridge's current recollection — which differs from a portion of his trial testimony — is that he jogged part way down Wisconsin Avenue and witnessed the attack from a distance before jogging back to the car at the corner of Fessenden and Wisconsin.

[11]      At trial, Petitioners testified they picked Jones up on Fessenden before turning right onto Wisconsin Avenue. Sousa's, Diamen's and Jones' current recollections are that Jones was picked up on Emery Street.

8

car.  The four then drove down Emery Street, turned left on Forty-First Street, left on Fessenden Street, and turned right on Wisconsin Avenue a short distance from the Godfather.  After traveling a few blocks north on Wisconsin, they were stopped and arrested by police.  Barber, Jennings, and Woods escaped on foot.[12]

The Government's theory of the case at trial was that the four men in the car when it was stopped by the police were the same four men who chased and stabbed Battle to death.[13]  The physical evidence clearly linked Jones to the murder.  He was soaked in the victim's blood.  By contrast, there was a complete lack of physical evidence linking the three Petitioners to the

---

[12]    Pamela Heim (now known as Pamela Binford), a government witness at trial, states she heard Barber and Jennings come into Richter's house shortly after the murder and say, "gotta lay low."  Although the government had tape-recorded a two-hour interview with Ms. Heim during its investigation, apparently no information about the interview was disclosed by the government to the defense at trial or since.  See Affidavit of Pamela Heim ¶¶ 9, 14 ("Heim Aff.") (Exhibit 8).

[13]    See Government's Opening Statement, Trial Transcript ("Tr.") at 66-67.  Since that time, the Government has fundamentally altered its theory of the case several times.  First, in 1991, the Government conceded that Barber, Jennings, and Woods "may well have participated" in the murder.  The government attorney in charge of this matter wrote:

> [T]he decision not to prosecute Chesley Barber, Charles Jennings and John Woods was premised on the perception by the prosecutors responsible for the case that it would be extremely difficult, if not impossible, to convict the three men, who may well have participated in the murder, but who, unlike Sousa, Eastridge, and [Diamen] were not apprehended near the scene of the crime.
>
> . . . A reasonable person viewing the evidence objectively could easily conclude that a substantial number of persons, including Messrs. Sousa, Eastridge, and [Diamen] ran after Battle, participated in his murder and, after the murder, in an attempt to flee, ran back to the automobile in which they had arrived.

June 17, 1991 letter from John M. Facciola to Kate Hill Germond and Jim McCloskey (Exhibit 9).

In an even more startling reversal from its position at trial, the Government then admitted during the first oral argument (on appeal of the denial of Petitioners' 23-110 motion) that "it is certainly reasonable to conclude" that Petitioners were not the actual stabbers.  See March 20, 1997 Oral Argument Tr. at 62 (before Judges Ferrin, Ruiz and Kern).

murder. For example, despite the fact that the murder was a blood-soaked event, Battle's blood was not found on any of the Petitioners.

In addition, there is now new evidence confirming that Petitioners were not at the scene of the stabbing. A previously undiscovered eyewitness from the neighborhood of the Godfather, John Gianaris, has stated in a sworn affidavit that there were no more than four men present during the attack on Battle, no car drove up Ellicott Street or arrived at the crime scene during the attack, and the car in which Petitioners were stopped was never at the scene of the stabbing.[14] See Affidavit of John S. Gianaris ("Gianaris Aff.") (Exhibit 10).[15]

Recently, Jones executed an affidavit in which he recanted his trial testimony and confessed to being one of the chasers/murderers. In his affidavit, he exonerates Petitioners, confirms they were not among the four who attacked Battle, and names two of the three other members of the group who along with Jones chased and murdered Battle. See Jones Aff. (Exhibit 4).

The most damning evidence against Petitioners at trial was testimony that Eastridge and Sousa had allegedly bragged about the murder to Dorothy Willetts. Willetts' testimony was essentially the only evidence at trial even suggesting that Eastridge and Sousa took part in the murder. The defense was given no advance notice of Willetts' allegations and was ill-prepared to impeach her.[16] Petitioners have since uncovered multiple witnesses who will testify that Petitioners Eastridge and Sousa did not make the alleged inculpatory statements. Each of the

---

[14] Gainaris' affidavit refutes the Government's latest theory of the case — that while Petitioners may not have been the actual stabbers, they at least were present during the stabbing — and therefore exonerates Petitioners of any crime in connection with the murder.

[15] Gianaris was discovered through repeated canvasses of the neighborhood by a Centurion Ministries investigator, Kate Hill Germond. See Germond Aff. ¶ 25 (Exhibit 2).

[16] The government first provided a copy of Willetts' grand jury testimony to defense counsel after the witness had already taken the stand.

eleven people Willetts claimed were present when these admissions were made, with the exception of her husband (who has not been interviewed), has refuted Willetts' allegations. In addition, several people who know Willetts have sworn she had a reputation within her community for lying, as well as a motive for falsely implicating Sousa and Eastridge in a murder they did not commit.

Finally, on various occasions, two of the other members of the Pagans confessed to participating in Battle's murder, and at the same time stated that Petitioners were not among the murderers. The attached Affidavit of Michael Grayson ("Grayson Aff."), a friend of John Woods, establishes that in early 1979 Woods admitted to him that Woods, Barber, Jennings, and Jones chased down and killed Battle. See Grayson Aff. ¶¶ 6-8 (Exhibit 5). Woods also admitted to Grayson that the three Petitioners were innocent. Another friend of Woods, Raymond Thomas Lurz, has also executed an affidavit stating that in October 1977, and again in February 1978, Woods admitted that he, Jennings, Jones, and a fourth person (whom Lurz refuses to identify) were the four chasers/murderers. See Affidavit of Raymond Thomas Lurz, Jr. ("Lurz Aff.") (Exhibit 6). Similarly, Richard Richter executed an affidavit in which he described two instances in which Woods confessed to his involvement in Battle's murder and admitted Petitioners were innocent.[17] Finally, Richter also testified that in November 1974, Charles Jennings admitted to him that Jennings had discarded his knife in the gutter while fleeing from the scene. Jennings also said he felt remorse because the three Petitioners were in jail for Jennings' actions.[18] See Affidavit of Richard Richter ("Richter Aff.") (Exhibit 7).

---

[17]    Richard Richter has passed away since signing this affidavit.

[18]    Woods and Jennings are now deceased.

The government's evidence against Petitioners at trial was scant. None of the four witnesses who saw Battle being chased by his killers identified the Petitioners as the chasers. To the contrary, the testimony of one government eyewitness suggested that Eastridge, who had been carrying a whiskey bottle the night of Battle's murder, was not one of the chasers. The eyewitnesses also described the chasers as being dressed differently than the Petitioners. No bloodstains from Battle were found on any of the Petitioners, even though the murder was a grisly stabbing that left Jones literally soaked in the decedent's blood. In light of the weak evidence against Petitioners at trial, the new testimony from Jones, Gianaris, Grayson, Lurz, Richter and the ten witnesses establishing that Petitioners Eastridge and Sousa did not make the alleged inculpatory statements shows that, in the words of Centurion Ministries' motto, "Surely, [these ones were] innocent." Luke 23:47.

This Petition demonstrates that constitutional violations have resulted in the conviction of several men who are actually innocent. See Schlup, 513 U.S. at 327 (quoting Murray v. Carrier, 477 U.S. 478, 496 (1986). The new evidence uncovered by Centurion Ministries identifies the men who were responsible for Johnnie Battle's death, and compellingly demonstrates that Petitioners were not among the killers. Thus, the new evidence "show[s] that it is more likely than not that no reasonable juror would have convicted [Petitioners] in the light of the new evidence." Id.

Supported by the new evidence, this Petition shows that petitioners are entitled to vacation of their convictions on several legal grounds. First, the trial court refused to sever the trials while simultaneously enforcing a rule that none of the defendants could introduce evidence of their innocence if it tended to inculpate any of the other defendants. This rule (the trial court's "Rule") violated Petitioners' rights under the Due Process Clause of the Fifth Amendment and

the Confrontation Clause of the Sixth Amendment by preventing them from introducing evidence of their innocence through direct testimony or cross-examination of other witnesses. In essence, the Rule prevented Petitioners from using the truth as a defense. The prejudicial effect of this Rule was particularly apparent with regard to the cross-examination of Jones who, unlike Petitioners, participated in the murderer yet testified to the contrary at trial.

Second, the prosecution's use of peremptory challenges to exclude while jurors from the jury violated Petitioners' Fifth Amendment Right to Due Process.

Finally, Petitioners did not receive effective assistance of counsel at trial consistent with the requirements of the Sixth Amendment, as their counsel forfeited obvious opportunities to exonerate them and to refute the testimony of Dorothy Willetts.

## STATEMENT OF FACTS

I.    FACTS ELICITED AT TRIAL

      A.    Petitioners Were Not Identified as Participating in the Altercation with Battle and His Companions

On the night of November 1, 1974, Petitioners attended a birthday party for Richard Richter at his home in Arlington, Virginia. Also present at the party were Richter, Stephen Jones, Chesley Barber, Charles Jennings, John Woods, Pamela Heim, Jill Summers, Tommy Greenwood, and Bruce Hunter. See Trial Transcript ("Tr.") at 1733-34.

During the course of the evening, this group drove in two cars to a nightclub called the Godfather at 4934 Wisconsin Avenue, N.W., in Washington, D.C. See Tr. at 1732-35. They parked both cars around the corner from the Godfather on Fessenden Street next to an alley. -

13

See Tr. At 1736.[19] They stayed at the Godfather for twelve to twenty minutes and left around midnight. See Tr. at 1740-41.

Upon leaving the Godfather, a verbal altercation occurred between Richter and three black men, one of whom was Johnnie Battle.[20] See Tr. at 423-24. Although Petitioners were in the general group with Richter, there is no evidence (nor even any allegation) that they participated in the altercation. The evidence at trial indicated that they were the last of the group to leave the Godfather and that, accordingly, they were not involved in the altercation. See Tr. at 1742, 2195, 2233, 2301.

After the altercation, Battle and one of his companions, Joe Brown, walked up Wisconsin Avenue, turned left on Fessenden Street, and walked down Fessenden Street to Battle's car. See Tr. at 133, 136. Battle's car was parked on the far side of the alley, past the two cars belonging to Richter's group. See id.; Map (Exhibit 1). Battle took his unregistered handgun out of his car. Tr. at 137. Battle and Brown returned to Richter and his companions, with Battle holding the gun in a pocket. See id.

Richter and his companions were heading towards their cars as Battle and Brown came upon them. See Tr. at 1753. One of the white males threw popcorn on Battle and Brown. See Tr. at 138, 190. Brown kept walking and twice asked Battle to "come on," but Battle stopped. See Tr. at 191. Battle drew his gun and fired shots at the group, see Tr. at 1381, wounding Bruce Hunter. See Tr. at 1758.

---

[19]   A map of the area surrounding the Godfather, where the murder took place, is attached as Exhibit 1.

[20]   It was for this altercation that Richter was charged, convicted at trial, but ultimately acquitted upon appeal for insufficient evidence of assault and for failure to sever his case from that of the other defendants.

14

B.    None of the Petitioners Were Identified as Chasing Battle

After the shooting, Battle ran away, and several, but not all, of Richter's companions ran after him. See Tr. at 426-27. Battle ran west on Fessenden Street to the intersection of Wisconsin Avenue and turned right, running south on Wisconsin Avenue toward Georgetown. See id. Battle crossed Wisconsin Avenue at an angle while running past the Godfather. See Tr. at 494Z.

Four witnesses at trial testified that they saw the chase of Battle. First, Tommy Motlagh, owner of the Godfather, testified he was standing outside the doorway of the Godfather when he heard gunshots. See Tr. at 494W-X. Motlagh testified he saw Battle running and being chased by two men, one of whom had a knife in his hand. See Tr. at 494Z. Motlagh described the chaser with the knife in the following manner:

> [He] had dark hair, with a mustache and goatee, and he had a tattoo on his arm, the one who had a knife in his hand . . . . He had a white T-shirt on and a black leather wrist[band] and the blue jeans.[21]

See Tr. At 494Z-495.

Motlagh testified on voir dire that he would be able to recognize the chaser with the knife and that he did not recognize any of the Petitioners as that man. See Tr. at 495T-U. Motlagh further testified before the jury that he could not describe other chasers because the man with the knife "[drew] my attention." Tr. at 495.

Second, Stephen Mathers, a doorman at the Godfather, testified he saw several men chasing Battle. See Tr. at 426-28. Mathers testified that the chasers were wearing "Levi jackets and all," Tr. at 427 and later that they were wearing blue jeans and T-shirts, see Tr. at 443.

---

[21]    Only one member of the group fit this description: Chesley Barber.

15

The third witness, Stephen Maday, was a patron of the Godfather. Maday testified that he had left the Godfather, "walked up Wisconsin Avenue a ways," then crossed Wisconsin Avenue in the direction of another nightclub, when he saw several persons chasing one individual. Tr. at 1825. Maday also testified that he saw another individual carrying a whiskey bottle "headed north on Wisconsin Avenue." Tr. at 1826-27 (emphasis added). Maday testified without contradiction that this person was "not" one of the chasers. Tr. at 1832.

Fourth, David Brady testified that he saw Battle being chased across Wisconsin Avenue, but Brady did not identify any of the chasers.

Thus, none of the witnesses identified any of Petitioners as having been among the chasers. Moreover, the description of the chasers did not match any of the Petitioners. When arrested minutes after Battle's death, Sousa was wearing a purple sleeveless shirt, a pair of blue jeans, and a pair of brown boots. See Tr. at 1232-33. Eastridge was wearing a long-sleeved brown plaid shirt, a pair of blue jeans, and a pair of brown boots. See Tr. at 1234-35. Diamen was wearing a pair of blue jeans, a striped shirt, and brown boots. See Tr. at 1236-37. None of them were wearing the Levi jackets or the t-shirts attributed to Battle's chasers, and none of them had a black leather wristband attributed by Motlagh to the chaser with a knife. See Tr. at 427, 443, 494Z-495. In addition, while Chesley Barber "always wore a clean white t-shirt [and] clean blue jeans . . . [and] had a trimmed goatee and moustache," none of the Petitioners had a goatee. Affidavit of Kathy Hafferman ¶ 4 ("Hafferman Aff.") (Exhibit 11).

C.      The Victim's Blood Was Not Found on Petitioners

Although the slaying was a blood-soaked event, Battle's blood was not found on any of Petitioners. Naval Petty Officer Second Class John White, who first happened upon Battle's body after the murder, testified at trial that it was "bleeding profusely," with "bleeding around

the face; . . . bleeding on the chest, . . . and . . . blood running from the mouth." Tr. at 349. White testified that in a few minutes the blood ran "about 20 feet or so" from Battle's body "all the way to the gutter of the street." Id.; see Tr. at 359. When White touched Battle's body to administer first aid, he got blood on his hands and on his wrists. See Tr. at 358. Police officers who arrived on the scene shortly thereafter described Battle's body as extremely bloody.[22]

Stephen Jones had blood all over him at the time of his arrest. His clothes were saturated with blood, which had soaked through his jeans to his long johns. See Tr. at 546-61. Blood was also found on Jones' jean jacket and boots, see id., and in the car where Jones had been sitting (but nowhere else in the car) see Tr. at 565-70, 1218-20.

By contrast, none of the Petitioners were found to have any blood from Battle on them, even though they had been stopped by the police only minutes after the stabbing. Eastridge had absolutely no blood on him, his clothes, his boots or his folding knife. See Tr. at 591-92, 626. Sousa had a tiny amount of dried blood on his shirt, which the FBI serologist described at trial as "[m]aybe about the fifth of the size of a dime, . . . half the size, maybe, of an eraser on a wooden pencil." Tr. at 587. This amount was too little for the government serologist to identify by type or age. See Tr. at 541, 587. Sousa did not have blood on his hands, boots or elsewhere on his body. See Tr. at 588-90, 758. Diamen had a minute amount of dried blood on the inside knee of his pants, (proximate to a tear in his jeans) and the government serologist testified at trial that the blood came from Diamen himself, not from Battle. See Tr. at 544-45. Like Eastridge and Sousa, Diamen did not have blood on his boots or any other part of his body or clothes. See Tr. at 94, 98, 543-45.

---

[22]    See Tr. at 906 (Sergeant James Horn stating there was "[a] great deal of blood, an excessive amount of blood"); Tr. at 971 (Sergeant Richard Scott stating that there was "quite a bit of blood").

D.    Petitioners Were Arrested Because of Their Association with Others

After the chasers went by, Motlagh saw two cars. See Tr. at 495A. The first car went south on Wisconsin Avenue. Tr. at 495A-B. Inside were Pamela Heim, the wounded Bruce Hunter, Jill Summers, Tommy Greenwood, and Richard Richter. See Tr. at 1760. This car took Hunter directly to Arlington Hospital. See id. The second car was an old green Plymouth. See Tr. at 495A. Motlagh initially said this second car had "two-three people in it," and later that there were "three or four guys." Tr. at 495A-B. He testified that this car also went south on Wisconsin Avenue and turned left on Ellicott Street.

A few minutes after the two cars had passed, Police Officer Eugene Ur arrived at the Godfather in response to a telephone call to the police by Motlagh. See Tr. at 495C. Motlagh told Officer Ur there had been "a shooting down the street." Id. While Motlagh was talking to Officer Ur, he saw a green car stop at the corner of Fessenden Street and Wisconsin Avenue. Id. Motlagh testified that this was the same green Plymouth, the second car he had seen driving south on Wisconsin Avenue. See Tr. at 495A-C.

Officer Ur got into his squad car, followed the green Plymouth, and stopped it three and one half blocks north of the Godfather on Wisconsin Avenue. See Tr. at 659-60. Officer Ur testified that Petitioners and Jones were in the car. See Tr. at 661. At the time of the arrest, Officer Ur noticed a Jim Beam whiskey bottle on the floor of the car between Eastridge's legs. See Tr. at 667, 824-25.

Later, Tommy Motlagh was taken by police to the green Plymouth on Wisconsin Avenue. See Tr. at 495I, 968. Motlagh testified that he identified Petitioners and Jones as "[t]he same people that left the Godfather." Tr. at 495I.[23] At trial, Motlagh testified on voir dire that

---

[23]    Motlagh later reiterated that he identified these people as having been at the Godfather earlier in the evening. See Tr. at 495J. Sergeant Scott testified without objection to the

18

he would have been able to recognize the man who had chased Battle with a knife and that he did not recognize any of the Petitioners or Jones as the man he had seen chasing Battle with a knife.[24] See Tr. at 495T-U. Counsel for the defendants failed to bring this out before the jury.

### E.    The Damning Testimony of Dorothy Willetts

Dorothy Willetts provided the only direct evidence at trial that Eastridge and Sousa took part in the murder of Battle, testifying that they repeatedly bragged about the murder in her presence. In light of the weakness of the foregoing evidence against Petitioners, Willetts' testimony clearly played a key role in achieving a guilty verdict.[25]

Willetts testified that their first self-incriminating statements occurred two weeks after the November 2, 1974 birth of her baby. Willetts said she ran into Sousa and Eastridge at a bar in Fredericksburg, Virginia called the Jockey Club. See Tr. at 1659-61. Willetts testified:

> after I told Nick that I heard he had some trouble, . . . he said, "While you were having the kid, we were killing a nigger in D.C.  . . ."
>
> I asked him, "Nick, you didn't really do anything like that, did you?"
>
> He said, "Not me; he did it." And he looked at Wayne.

---

following hearsay about Mr. Motlagh: "I asked him if he could recognize anyone, and he said 'that's the subjects that were chasing the negro male just a little earlier'." Tr. at 968. Counsel for Petitioners failed to object to this testimony as erroneous hearsay, they failed to cross-examine Motlagh and elicit a reiterated admission that he did not identify Petitioners as chasers, and they failed to argue to the jury on closing argument that Sergeant Scott's testimony was wrong.

[24]    When Jones was arrested, the police found his knife still on him, in its sheath with no blood on it. See Tr. at 625-26.

[25]    Despite Willetts' testimony that eleven other individuals had been present when the incriminating statements were allegedly made, Willetts was the only government witness called to testify to these alleged statements. As shown below, (with the exception of Willetts' husband who has not been interviewed) all of the others alleged to have been present would have refuted Willetts' testimony. See infra, Statement of Facts, Part III.

> And Wayne said to Nick, said, "You're the one that cut his nose off."
>
> And Nick said, "Well, yeah, I did that, but you sliced his ear."
>
> And Nick also said, "You shouldn't have gone so crazy."
>
> And Wayne said, "Well, I just can't help it when I get to stabbing. I can't help it. I can't quit. I kept on going."

Tr. at 1662-63. Willetts said she had heard this conversation about cutting Battle's nose and ear repeated many times - "[m]aybe seven or eight - ten. A lot." Tr. at 1675.[26]

Second, Willetts said she saw Sousa at a nightclub, Hornes, in Fredericksburg during "late March or early April" 1975. Tr. at 1666. Willetts testified that Sousa got into an argument with the waitress about the amount of change he was owed and threatened the waitress "that she would either give all of his money back or he would cut her like he did that nigger in D.C." Tr. at 1667-68.

Third, Willetts testified that she saw Sousa at a "buffet type breakfast place" in Fredericksburg called the Scottish Inn on November 9, 1975. Tr. at 1671-72. Willetts said she told Sousa that she had appeared before the grand jury and that she would not lie if called as a witness at his trial. Tr. at 1673. She testified that Sousa said, "'Yeah, I know; that's what worries me.' He said, 'With what you could say, I might get forty years.'" Id.

---

[26]    Willetts' statements conflicted with the physical evidence in the possession of the government. For example:

•    According to Willetts, Sousa repeatedly stated he cut off Battle's nose, Tr. at 1663, 1675, but in fact, Battle's nose was not cut off;

•    According to Willetts, Eastridge repeatedly stated he sliced off Battle's ear, Tr. at 1663, 1675, but, in fact, Battle's ear was not cut, and Eastridge's knife did not have any blood on it when he was arrested shortly after the crime, Tr. at 626.

II.    NEWLY DISCOVERED EVIDENCE OF PETITIONERS' INNOCENCE

A.    Recantation and Confession of Stephen Jones

Stephen Jones has, for the first time, signed an affidavit recanting his testimony in his defense at trial. See Jones Aff. (Exhibit 4). Jones now testifies that Petitioners "did not play any role in the murder of Johnnie Battle." Id. ¶ 4. Jones has identified the actual killers of Johnnie Battle as Charles Jennings, John Woods, and Chesley Barber, and now admits he was the fourth person involved in the chase/murder. See id.; Germond Aff. ¶ ¶ 15, 21 (Exhibit 2).

At trial, Jones testified that he chased Battle across Wisconsin Avenue after Battle shot Bruce Hunter. Tr. at 2427-29. Even in the face of evidence that he was drenched in blood matching that of the victim, Jones testified at trial that he stopped chasing Battle and hid behind a tree and, therefore, did not see or participate in Battle's murder. Tr. at 2428-30. Jones claimed he did not see who killed Battle. Tr. at 2431.

Jones recants the parts of his testimony in which he denied catching Battle, participating in Battle's murder, and seeing the other perpetrators of Battle's murder. Jones Aff. ¶ 4 (Exhibit 4). Jones states he chased Battle up Fessenden Street and down Wisconsin Avenue, across the corner of a small park across the street from the Godfather, then across Emery Street and down an alley. Id. ¶¶ 10-11. Jones now admits he followed Battle through the alley into Ellicott Street and caught him in a parking lot on the south side of Ellicott Street. Id. ¶ 12.

In his affidavit, Jones now testifies that he tackled Battle and began to punch him in the face. Id. ¶ 13. He further states that Charles Jennings, John Woods, and one other person caught up to Battle and him, and that Jennings stabbed Battle with a buck knife. Id. He further states

21

that Woods held Battle down while Jennings stabbed him and that the fourth person "started to stab Battle with his large Bowie knife." Id. ¶ 13.[27]

Although Jones has been unwilling to specifically identify in his affidavit the fourth killer with the "large Bowie knife," he has confirmed to Centurion Ministries investigator, Kate Hill Germond, that this person was Chesley Barber. Germond Aff. ¶¶ 15, 20-22 (Exhibit 2). This statement is corroborated by other evidence. First, Barber owned a large Bowie knife, which was missing shortly after the murder and which matched the description of the large bloody Bowie knife found by Rose Cleary, near the scene of the crime. See Hafferman Aff. ¶¶ 5, 7 (Exhibit 11); Map (Exhibit 1). Second, Barber fit Motlagh's description at trial of one of Battle's chasers. Third, Pamela Heim, a prosecution witness at trial who was with the group celebrating Richter's birthday, has signed an affidavit in which she states that after Battle was killed, she saw Barber accompany Jennings into Richter's house and heard one say to the other, "gotta lay low."[28] Fourth, as discussed below, in the course of confessing to his own involvement, John Woods identified Barber as the fourth murderer. See infra, Statement of Facts, Part II.B.

Jones now testifies that after the stabbing, he ran back through the alley to Emery Street. Jones Aff. ¶ 16 (Exhibit 4). Jones saw the green Plymouth coming up Emery Street. Id. ¶ 17. When the car stopped, Jones got in. Jones told Sousa, who was driving, to "get the hell out of here," but he did not tell the Petitioners that Battle had just been killed. Id. ¶¶ 17-18. Jones states he had blood on him, but that the corner where he was picked up was very dark. Jones notes he had cut his hand, did not explain to Eastridge, Sousa or Diamen how he had cut it, but that Eastridge gave him a newspaper to wrap his hand. Id. ¶ 18.

---

[27]    Jones continues to state that he did not stab Battle. See Jones Aff. ¶ 15 (Exhibit 4). The evidence at trial corroborates this in that Jones' knife did not have any blood on it. Tr. at 625-26.

[28]    Heim Aff. ¶ 9 (Exhibit 8).

Jones testifies that when he saw the green Plymouth, it was the first time he had seen any of the Petitioners since before he started chasing Battle. Id. ¶ 19. Jones states, "I do not personally know where they were, but I know that they did not take part in killing Battle." Id.

Jones states he falsified his testimony at trial for three reasons. First, telling the truth would have implicated him in the murder of Battle. Second, Jones abided by a rule of the Pagan Motorcycle Club, under which no Pagan was ever to turn another Pagan in to the police for any reason, even if an innocent person had been arrested. Third, Jones did not want to implicate Jennings, Woods, and Barber because they were his friends. By contrast, he "hardly knew" the Petitioners. Id. ¶ 21.[29]

Jones' new testimony establishing Petitioners' innocence, is corroborated by sworn statements from three independent witnesses.

### B.    Testimony of Michael Grayson

The testimony of Michael Grayson, which corroborates Jones' recantation/ confession, was unavailable at trial because it relates to admissions made by one of the actual murderers several years after the trial. Grayson was an active member of the Pagans from 1971 to 1983. Grayson Aff. ¶ 2 (Exhibit 5). Grayson knew John Woods a/k/a "Wrench," who was also a member of the Pagans. In late January or early February 1979, Grayson visited the home of John Woods in Annandale, Virginia. Id. ¶ 4.

During this visit, Woods admitted to Grayson his involvement in the murder. Woods said Eastridge, Sousa, and Diamen all were innocent of the murder of Battle. Id. ¶ 6. Woods said he, Jennings, Barber, and Jones chased and killed Battle.

---

[29]    Jones has not seen or spoken to Petitioners since the day their conviction was announced on January 6, 1976. Jones Aff. ¶ 7 (Exhibit 4). Jones no longer participates in Pagan Motorcycle Club activities.

Woods told Grayson that, immediately before Battle was killed, Battle had shot a gun at some Pagans. Id. ¶ 7. Corroborating Jones, Woods stated that Battle ran away when he stopped shooting and that Barber, Jennings, Jones, and himself (Woods) chased him. Id. Woods stated that Jones caught up to Battle first and tackled him. Id. ¶ 8.

C.    Testimony of Raymond Thomas Lurz, Jr.

The testimony of Raymond Lurz, which corroborates Jones' recantation/ confession, was not available at trial because it relates to admissions made by one of the actual murderers several years after the trial. Raymond Thomas Lurz, Jr., a/k/a "Lazy," was a member of the Pagans in 1977 and 1978, and was acquainted with Woods. Lurz Aff. ¶ 3 (Exhibit 6). Lurz attended a Pagan meeting in October 1977 in Pequea, Pennsylvania. At this meeting, Woods told him about Battle's murder. Woods stated that Battle was killed in retaliation for shooting Bruce Hunter. Woods told Lurz that Petitioners Eastridge, Sousa and Diamen had not been involved in the murder. Id. ¶ 4.

In February 1978, Lurz again discussed with Woods the murder of Battle. Id. ¶ 5. Woods told Lurz that nothing could be done to gain the release of Petitioners because Woods himself had been involved in the murder. Woods stated that Jennings, Jones, and one other person also had been involved. Lurz states that Woods refused to specifically identify by name the fourth killer (Barber) because he was afraid such person would implicate Woods as having been involved in Battle's murder. Id.

Woods' description of the murder further corroborates Jones. Woods told Lurz that the four actual murderers of Battle chased him for a couple of blocks, then Jones caught Battle and wrestled him to the ground. Id. ¶¶ 6-7. Woods stated that Jennings, himself, and the fourth chaser (Barber) then caught up to Battle and stabbed him to death.

D.     Testimony of Richard Richter

Jones' recantation/confession is further supported by the testimony of Richard Richter a/k/a "Cheyenne," who served as a ranking member of the Pagans in 1974 and 1975. Richter Aff. ¶ 2 (Exhibit 7). Richter's testimony was not available to Petitioners at trial since Richter himself was a codefendant, and the trial court's Rule (see infra Argument, Part II) prohibited Petitioners from eliciting testimony inculpating codefendant Jones. Richter, Jennings a/k/a "Slick," and Woods were friends and members of the Pagans' Virginia Chapter. Id. Richter learned through conversations with club members that "Eastridge, Diamen and Sousa did not participate in any way in the stabbing" of Battle. Id. ¶ 4. In addition, Richter learned that Jones, Jennings, Woods, and Barber were the ones responsible for Battle's death. Id.

In November 1974, Richter visited Jennings' home and had a conversation with Jennings' girlfriend. (Jennings was not home at the time.) During this visit, Jennings' girlfriend told Richter that she now "[knew] what [she] need[ed] to get Slick for Christmas. A new buck knife." Id. A few days later, Richter had a conversation with Jennings during which Jennings confessed to throwing his knife into the sewer while fleeing from the scene of Battle's murder. Id. [30]

Richter had a conversation with Woods in 1975 in which Woods admitted he had chased Battle and was present at the scene of the murder. Id. ¶ 5. Woods asked Richter what he should do because innocent people (Eastridge, Diamen, and Sousa) were going to trial for his actions. Id.

---

[30]     In addition to the three affidavits discussed above, John Woods admitted to Benny Baker and Michael Marron his participation in Battle's murder. Centurion Ministries has been unable to obtain affidavits from Baker and Marron. See Germond Aff. ¶¶ 19, 52 (Exhibit 2).

E.    Testimony of John Gianaris

The foregoing testimony of Jones, Lurz, Grayson and Richter, unavailable at the time of the trial, is now corroborated by yet a fourth previously unknown witness, John Gianaris. Gianaris was an eyewitness whose existence was unknown to Petitioners at the time of trial and consequently was not called to testify. Gianaris has never been a member of the Pagan Motorcycle Club and has never met any of the Petitioners. Gianaris is an independent eyewitness, who was present at the location where Battle's body was found, and actually saw the stabbing and killing of Battle.[31]

On the night of November 1, 1974, Gianaris was walking up an alley that runs between Ellicott Street and Emery Street in northwest Washington, D.C. See Gianaris Aff. ¶ 2 (Exhibit 10). When Gianaris reached Ellicott Street, he heard loud voices. Gianaris jumped over a chain link fence bordering the alley and Ellicott Street. See id.; see also Map (Exhibit 1).

Through the chain link fence, Gianaris saw a black man run into the parking lot across Ellicott Street. Gianaris Aff. ¶ 3. Two white men were chasing the black man. Gianaris then saw one or two other white men running up from behind. Gianaris saw the white men attack the black man in the parking lot. See id. Gianaris then saw the white attackers get up from the black man and run away. See id. ¶ 5. Gianaris did not see any car pull up Ellicott Street during the murder. See id.

---

[31]    There was a single government witness who alleges he saw a stabbing: David Brady. Brady said the murder occurred on the corner of Emery Street and Wisconsin Avenue. Tr. at 1179. This location is not where Battle's body was found, nor was there any evidence of blood or other signs of a struggle found at this location. Other witnesses to the chase, Motlagh, Mathers, and Maday, testified that they did not see the stabbing of Battle, although they clearly could see the corner of Emery Street and Wisconsin Avenue from the front of the Godfather which is just across the street. In any event, Brady did not identify any of the Petitioners as having participated in the murder.

26

Gianaris' testimony is crucially important for two reasons. First, Gianaris corroborates the statements of Jones, Woods, Jennings and Richter, by stating that no more than four persons took part in the chase/murder. While testimony about the number of alleged "chasers" of Battle ranged from two to six, see, e.g., Tr. at 494Y-Z, 496C (Motlagh saying there were two chasers); Tr. at 426-27, 432, 487 (Mathers saying three to six chasers); Tr. at 1825 (Maday saying four to six chasers), Gianaris provides uncontroverted direct evidence that no more than four persons actually attacked Battle or were present during the attack.

Second, Gianaris makes clear that neither the green Plymouth nor any other car came down Ellicott Street during the murder. Gianaris provides a powerful counterpoint to the lone testimony of Motlagh that Eastridge's green Plymouth turned left off of Wisconsin Avenue onto Ellicott Street, instead of Emery Street. See Tr. at 495A.[32] Gianaris' testimony establishes that Petitioners did not drive up to the murder scene in Eastridge's car to participate in the murder. In addition, Gianaris' testimony refutes suggestions made by the government since the time of trial that "a substantial number of persons, including [Petitioners] ran after Battle [and] participated in his murder." June 17, 1991 letter from John M. Facciola to Kate Hill Germond and Jim McCloskey at 2 (Exhibit 9). Gianaris' testimony together with Jones' testimony establishes that there were only four individuals who chased and stabbed Battle, and that none of the four were the Petitioners.

III.    NEW EVIDENCE OF WILLETTS' LIKELY PERJURY

Dorothy Willetts' testimony was highly suspect in ways never called to the attention of the jury.

---

[32]    Motlagh likely confuses "Ellicott" Street with "Emery" Street. See Map (Exhibit 1).

A.    Multiple Witnesses Testify That Petitioners Did Not Make the Inculpatory Statements Willetts Alleged at Trial

In the course of her trial testimony and pre-trial statement ("Willetts Statement") (Exhibit 12) to Assistant U.S. Attorney Guerrieri on June 26, 1975, Willetts identified eleven other people who were present during alleged incriminating statements made by Eastridge and Sousa . Centurion Ministries interviewed all of these individuals except for Willetts' husband. All ten refute Willetts' trial testimony.

Jockey Club - 1. Willetts testified at trial that Charles Willetts (her husband), Patricia Moser, and Rita Kerr were all present when Eastridge and Sousa allegedly confessed at the Jockey Club in mid-November 1974. Tr. at 1661. Patricia Moser (now known as Patricia Moser Davis) is a homemaker living in the Fredericksburg area. Affidavit of Patricia Moser Davis ¶ 1 ("Moser Aff.") (Exhibit 13). Moser states that while she met Willetts in November 1974, she did not begin to socialize with her until several months later. Id. ¶ 8. Accordingly, Moser could not have been present with Willetts at any alleged confession at the Jockey Club in November 1974.

Rita Kerr, now known as Mary G. Snyder is a homemaker living in the Fredericksburg area. See Affidavit of Mary G. Snyder ¶ 1 ("Snyder Aff.") (Exhibit 14). Kerr has read the statement Willetts gave to Assistant U.S. Attorney Guerrieri and the transcript of Willetts' testimony at trial. See id. ¶ 4. Kerr states she never heard any confession at the Jockey Club such as Willetts alleged or anywhere else. See id. ¶ 5. Kerr "never heard either Wayne Eastridge or Nick Sousa talk about the Washington, D.C. murder, except to say that they were innocent." Id.

Hornes Bar. Willetts identified Pat Moser and a waitress, "Lill," who was Willetts' former sister-in-law, as having been present when Sousa allegedly threatened "Lill" that he would "cut her like he did that nigger in D.C." Tr. at 1667-68; accord Willetts Statement at 2

28

(Exhibit 12). Moser states she never heard or saw Sousa make any threat to Lillian Gordon or anyone else by reference to a murder in the District of Columbia. Moser Aff. ¶¶ 7, 17 (Exhibit 10).

"Lill" is Lillian Gordon, the sister of Charles Willetts' prior wife, who was a waitress at Hornes Bar in 1974-75. Affidavit of Lillian L. Gordon ¶¶ 2, 5 ("Gordon Aff.") (Exhibit 15). Gordon states that Sousa "never made any rude or threatening comments to me, either while I was working at Hornes or elsewhere. He has always treated me in a respectful manner." Id. ¶ 7. Gordon states that the conversation alleged by Willetts did not occur and could not have occurred because she "never waited on a table where Dorothy Willetts was sitting" and she never saw Willetts and Sousa sitting together at Hornes. Id. ¶ 6. Gordon states, "Sousa never stated in my presence that he had harmed a black man" or anyone else in the District of Columbia. Id. ¶ 8.

Scottish Inn. Willetts testified at trial that her husband, Sandra Kerr, Michael Kerr, and Fran Dillard were all present at the Scottish Inn when Sousa allegedly made inculpatory statements regarding the murder. Tr. at 1672-73. Michael "Kerr" is Michael Kurz, who was married to Sandra Kurz (now Sandra Garland), the foster sister of Willetts' husband. See Affidavit of Michael Kurz ¶ 2 (Exhibit 16). Kurz states that he and Sandra Kurz socialized with Willetts at each other's homes and at family gatherings during 1974-76. Id. ¶ 3. Kurz is "certain" that he "never heard Nick Sousa or Wayne Eastridge discuss the murder charges that were pending against them." Id. ¶ 8. Kurz states that he does not recall ever going to the Scottish Inn under any circumstances. Id. ¶ 5. Kurz is "certain" he has never seen Sousa or Eastridge in the presence of Dorothy Willetts, Charles Willetts, or Bran Dillard. Id. ¶ 6.

29

Sandra Kurz, despite being Willetts' sister-in-law and hostile to Eastridge and Sousa, affirms that she never heard Sousa or Eastridge implicate themselves in Battle's murder. Germond Aff. ¶ 49 (Exhibit 2).

Bran Dillard lives in Fredericksburg, Virginia, where he owns a music store and operates a Christian music ministry for teenagers. See Affidavit of Walter B. ("Bran") Dillard ¶ 1 (Exhibit 16). Dillard says he was aware in November 1975 that Eastridge and Sousa were charged with a murder in Washington, D.C. and is "sure" he would "remember any discussion or reference by either of them about those charges." Id. ¶ 3. Dillard states he "never heard Eastridge or Sousa say anything about the charges except that they were innocent." Id. ¶ 4. Dillard states that he never heard Sousa, Eastridge, or Willetts discuss the trial, murder, or charges against Sousa and Eastridge. See id. ¶ 6.

B.    Additional Witnesses Testify That Petitioners Did Not Make the Inculpatory Statements Willetts Alleged in Her Police Statement

In her statement to Assistant U.S. Attorney Guerrieri, Willetts described several other alleged inculpatory statements by Eastridge and Sousa and identified persons present during the statements. Again, each of these persons (with the exception of her husband who has not been interviewed) refute her accusations.

Jockey Club - 2. Willetts described an additional incident at the Jockey Club, at which her husband Charles, Pat Moser, and Moser's date, Tommy Newton, were present. Willetts Statement at 3 (Exhibit 12). Willetts claimed that Sousa and Eastridge argued with Newton about his being with Moser and threatened Newton by reference to the D.C. murder. Id. Willetts stated that "Wild Willy the bouncer" came over and told Nick to sit down and not cause any trouble. Id.

All of the persons Willetts identified as being present refute her story. First, Moser confirms that she did have a date with Tommy Newton at the Jockey Club during this time period and Sousa saw them there, but she is unequivocal that Sousa never threatened Newton with the D.C. murder and that she "never heard Eastridge argue with or threaten Newton, or say he would harm him." Moser Aff. ¶ 10 (Exhibit 13). Second, Tommy Newton confirms that neither Eastridge nor Sousa threatened him during his date with Pat Moser at the Jockey Club or elsewhere, or on any other occasion. See Affidavit of Thomas Newton ¶ 5 ("Newton Aff.") (Exhibit 17). Newton states, "Neither of them ever mentioned the murder charge or the stabbing of a black man" and that he "definitely would have recalled" any such threat against him or such statement. Id. Third, Wilson ("Willy") Jones who was the manager and bouncer at the Jockey Club, says he has read Willetts' police statement and knows "for a fact" that the account of an argument between Sousa and Eastridge and Newton is untrue. Affidavit of Wilson Jones ¶¶ 2, 9 ("Wilson Jones Aff.") (Exhibit 18). Jones recalls seeing Newton with Moser in The Jockey Club in 1975 and that Newton left the club without any argument or incident with Eastridge or Sousa. See id. ¶ 10. Jones says he never heard Eastridge or Sousa "mention or comment on" the murder charge. Id. ¶ 8.

Jockey Club - 3. Willetts described a third incident at the Jockey Club on June 7, 1975, during which Sousa and Eastridge allegedly threatened "to cut" another of Pat Moser's dates, Billy Buchholz. Willetts Statement at 4 (Exhibit 12). Willetts stated that "Wild Willy" came over and told Sousa that "the cops had been called and were sitting in the parking lot." Id.

Once again, each person Willetts placed at the scene contradicts her story. First, Wilson Jones says he "never witnessed any incident or fight involving Sousa, Eastridge, and Billy Buchholz (or anyone else)," and "never called" and never said he called the police "in response

31

to Sousa's or Eastridge's conduct" in the club.  Wilson Jones Aff. ¶ 11 (Exhibit 18).  Second, Pat

Moser says she never dated anyone named "Billy" during the period between the arrest of Sousa

and Eastridge and their trial.  Moser Aff. ¶ 12 (Exhibit 13).  While Moser dated Billy Buchholz

later, she is certain she was not at the Jockey Club with Billy Buchholz in June 1975, and that

she "never witnessed Sousa or Eastridge arguing with or threatening Billy Buchholz" for any

reason.  Id. ¶ 13.  Third, Buchholz confirms he "never dated Pat Moser until after the trial of

Eastridge and Sousa had begun," Affidavit of William Buchholz ¶ 3 (Exhibit 19), and never

encountered Sousa or Eastridge while on a date with Moser, id.  Buchholz states that Sousa never

threatened him at the Jockey Club or anywhere else for any reason.  Id. ¶ 4.

      C.      Evidence of Willetts' Lack of Credibility and Motive for Presenting False
            Testimony

Willetts had a general reputation for lying and untrustworthiness in her community, of

which the jury was never made aware.  Affidavit of Betty Jean Coker ¶ 5 ("Coker Aff.")

(Exhibit 20); Affidavit of Joyce Hughes ¶ 5 ("Hughes Aff.") (Exhibit 21).  See also Affidavits of

Clayton Spindle, Betty Richardson, John Wayne (Richardson) Edwards, Linda Sousa, and

Donald Lee Farmer (Exhibits 22-26).  In addition, Willetts had a motive to implicate Eastridge

and Sousa in the murder of Battle, of which the jury was never made aware.  Willetts had once

been a paramour, in turn, of Eastridge and of Sousa.  Coker Second Aff. ¶¶ 7-10 (Exhibit 20).

Both Eastridge and Sousa had spurned her.  Id.  Moreover, on one occasion in early summer

1975 (near the time of her June 26, 1975 statement to the police inculpating Petitioners), Willetts

told one of her acquaintances, Joyce Hughes, that she had an argument with Wayne Eastridge and that she would "get even" with him.[33]  Hughes Second Aff. ¶ 4 (Exhibit 21).

## ARGUMENT

IV.    THIS COURT HAS JURISDICTION TO ENTERTAIN THE PETITION UNDER SECTION 2241 BECAUSE AS INTERPRETED BY THE D.C. COURT OF APPEALS SECTION 23-110 IS INADEQUATE OR INEFFECTIVE TO TEST THE LEGALITY OF PETITIONERS' DETENTION

Under 28 U.S.C. § 2241 ("Section 2241"), a prisoner who is being detained in violation of the U.S. Constitution may apply for a writ of habeas corpus in federal court.  D.C. Courts, however, under D.C. Code Ann. § 23-110 ("Section 23-110"), have exclusive jurisdiction to hear petitions by D.C. prisoners moving to vacate, set aside, or correct their sentences, unless it appears that Section 23-110 "is inadequate or ineffective to test the legality of [the prisoner's] detention."  D.C. Code Ann. § 23-110(g).  Section 23-110 was inadequate or ineffective as applied to Petitioners, because the D.C. Court of Appeals failed to apply the "miscarriage of justice exception" set out by the Supreme Court in Schlup v. Delo, 513 U.S. 298 (1995), and because it mischaracterized Petitioners' Section 23-110 motion as a Motion for a New Trial Pursuant to Rule 33 of the Superior Court's Rules of Criminal Procedure.  Therefore, the D.C. Courts do not have exclusive jurisdiction over Petitioners' claims, and this court has jurisdiction to hear those claims under Section 2241.  See Swain v. Pressley, 430 U.S. 372, 381 (1977) (Section 23-110 allows a federal district court to entertain a habeas corpus application if remedy by motion is inadequate or ineffective); cf. Triestman v. United States, 124 F.3d 361,

---

[33]    Willetts made a similar threat regarding another boyfriend who had left her to return to his wife, and later later took an overdose of pills, perhaps in retaliation.  See Affidavit of John Wayne (Richardson) Edwards ¶ 2 (Exhibit 24).

33

374-75 (2d Cir. 1997) (if 28 U.S.C. § 2255 is inadequate or ineffective, prisoner entitled to seek

a writ of habeas corpus pursuant to Section 2241).

> A.    The D.C. Court of Appeals Rendered Section 23-110 Inadequate or Ineffective by Failing To Apply the Miscarriage of Justice Exception to Procedural Bars

In Schlup, the U.S. Supreme Court held that there is a "miscarriage of justice" exception

to procedural bars in habeas corpus proceedings. 513 U.S. at 316-17. The miscarriage of justice

exception mandates that a prisoner who raises a constitutional claim supplemented by a colorable

showing of actual innocence may have his collateral challenge addressed on the merits,

regardless of procedural obstacles that otherwise would bar his claims. Petitioners clearly meet

the requirements of this exception. Because the D.C. Court of Appeals held that Section 23-110

does not provide relief under the miscarriage of justice exception to the same extent required by

the Supreme Court in federal habeas corpus, Section 23-110, as applied, is inadequate or

ineffective to test the legality of Petitioners' detention. See Swain, 430 U.S. at 381-82 (stating

that the scope of the remedy provided by Section 23-110 is the same as that provided by Section

2255 and habeas corpus).

> 1.    According to the Miscarriage of Justice Exception, a Prisoner Who Raises Constitutional Claims and Supplements those Claims with a Showing of Actual Innocence May Have His Claims Heard on the Merits Despite Any Procedural Bars.

The protection of the innocent against unjust incarceration is among the most

fundamental principles of our criminal law. In Schlup, the U.S. Supreme Court stated that:

> concern about the injustice that results from the conviction of an innocent person has long been at the core of our criminal justice system. That concern is reflected, for example, in the "fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free."

Id. at 325 (quoting In re Winship, 397 U.S. 358, 372 (1970) (Harlan, J., concurring)).  Because of the importance of protecting the innocent, the Supreme Court has stated that where a prisoner has a colorable claim of actual innocence a court must, in certain instances, entertain a prisoner's collateral challenge on the merits even though the claims otherwise would be procedurally barred.

In Schlup, the Court addressed the situation in which a prisoner alleges that his trial was constitutionally flawed, and supplements that claim with a colorable showing of actual innocence.  In such a situation, the prisoner can obtain reconsideration of an otherwise procedurally barred constitutional claim by presenting new evidence showing that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence."  Id. at 327-28.[34]  The Supreme Court stated that if a prisoner makes such a showing, then a court *must* entertain the prisoner's constitutional claims on the merits — despite any procedural bars — because it would constitute a miscarriage of justice to procedurally bar his claims.  See Kuhlmann v. Wilson, 477 U.S. 436, 454 (1986).  This exception to procedural bars in post-conviction review is known as the "miscarriage of justice" exception.

> 2.    The Petitioners Satisfied the Requirements of the Miscarriage of Justice Exception Set Forth in Schlup.

The Petitioners satisfied the requirements of the miscarriage of justice exception set forth in Schlup.  First, as the exception requires, Petitioners' claims are based on constitutional

---

[34]    This standard is less strict that that set forth in Herrera v. Collins, 506 U.S. 390 (1993). Herrera suggested that when a prisoner raises a collateral challenge to a conviction based on a free-standing claim of actual innocence (untied to any allegation of constitutional error at trial), only a "truly persuasive demonstration of 'actual innocence'" would constitute a sufficient ground for federal habeas relief.  Id. at 417.  Schlup, however, deals with a different situation — namely, the situation in which a claim of actual innocence is used to support an allegation of constitutional error at trial.  513 U.S. at 324-27.

violations — namely, that the trial court's Rule violated their rights under the Fifth and Sixth Amendments, the prosecution's use of peremptory challenges violated their Fifth Amendment right to due process, and they did not receive effective assistance of counsel at trial as required by the Sixth Amendment.

Second, Petitioners' constitutional claims are supplemented with newly discovered evidence that demonstrates that they are actually innocent. This evidence, if it had been available at trial, would have been very damaging to the government's case. The government's case at trial consisted essentially of two pieces of evidence: (1) the fact that shortly after the murder took place, Petitioners were found in a car along with Jones, who was covered with the decedent's blood, and (2) Dorothy Willetts' testimony that Eastridge and Sousa had told her that they had killed a black man in D.C.

It is more likely than not that no reasonable juror would have convicted Petitioners based on this evidence if the new evidence of their innocence had been available at trial. The affidavits of Jones, Grayson, Lurz, and Richter counter the government's first piece of evidence. The affidavits demonstrate that only four men participated in the murder and that Jones was definitely one of them and that Woods, Jennings, and Barber almost certainly were the other three. In addition, Gianaris' testimony refutes suggestions made by the government since the time of the trial that "a substantial number of persons, including [Petitioners], ran after Battle [and] participated in his murder." June 17, 1991 letter from John Facciola to Kate Hill (Germond) (Exhibit 9). Thus, the evidence now shows that Petitioners are not guilty of the crime for which they were incarcerated, or of aiding and abetting that crime. Additionally, other new evidence strongly refutes the government's second piece of evidence, Willetts' testimony. This evidence consists of affidavits from people who were present when Petitioners allegedly confessed to the

36

murder, stating that they did not hear any such admission, and other affidavits to the effect that Willetts was a known liar and that she had a motive to falsely accuse Eastridge and Sousa. This evidence, taken together, creates more than a mere reasonable doubt about Petitioners' guilt. The D.C. Court of Appeals admitted as much when it stated that Petitioners "presented a non-frivolous claim that they have spent many years behind bars for a crime that they did not commit." See Diamen, 725 A.2d at 513.

In fact, even the Government has conceded that, in light of the new evidence, it does not find Willetts' testimony to be credible. During the first oral argument (on appeal of the denial of Petitioners' 23-110 motion), the Government stated that "it is certainly reasonable to conclude" that Petitioners were not the actual stabbers. March 20, 1997 Oral Argument Tr. at 62 (before Judges Ferrin, Ruiz, and Kern). Of course, if Petitioners did not actually stab Battle, then Willetts' testimony is false. If it is "reasonable to conclude" that Willetts' testimony is false, as the Government has conceded, then, given the fact that her testimony was the only direct evidence at trial linking Petitioners to the murder, it is more likely than not that no reasonable juror would find Petitioners guilty in light of the new evidence.

Thus, Petitioners have a colorable claim of actual innocence, along with a constitutional challenge to their convictions. They therefore satisfy the requirements of Schlup's miscarriage of justice exception.

      3.     The D.C. Court of Appeals Failed To Apply the Miscarriage of Justice Exception to Petitioners' Motion.

Despite the Supreme Court's conclusion that a court must not procedurally bar a prisoner's claim when the miscarriage of justice exception is satisfied and despite the fact that Petitioners satisfied the exception, the D.C. Court of Appeals procedurally barred Petitioners' claims. The D.C. Court of Appeals did not recognize that, under Schlup, procedural obstacles

37

must give way to the constitutional claims of an actually innocent prisoner. Although all three judges on the panel agreed that at a minimum, Petitioners "presented a non-frivolous claim that they have spent many years behind bars for a crime that they did not commit," Diamen, 725 A.2d at 513, the majority refused to hear Petitioners' motion on the merits, giving greater priority to two procedural bars: res judicata and the time limit contained in Rule 33.

The majority first held that Petitioners' motion was barred by res judicata. The court concluded that Petitioners' constitutional challenge could not be considered on the merits because the same claim was previously decided on direct appeal and that adjudication is binding on any subsequent panel.[35] See id. at 509-10. The majority also held that Petitioners' motion was barred by the two-year time limitation contained in Rule 33 of the Superior Court's Rules of Criminal Procedure. See id. at 513-14. Because a Rule 33 motion based on newly discovered evidence cannot be filed more than two years after final judgment, and Petitioners filed their motion after this two-year time period had elapsed, the court concluded that Petitioners' claims could not be entertained on the merits.

The majority did not apply Schlup. In regard to the res judicata issue, the court stated that "Schlup is . . . basically about federalism." Id. at 512. The majority apparently was referring to the fact that in Schlup, the Supreme Court addressed the miscarriage of justice exception in the context of Section 2254, a collateral challenge to a state court judgment. The holding of Schlup, however, is not about federalism. It is generally acknowledged that Schlup applies equally in the context of a Section 2255 motion (involving a collateral attack on a federal

---

[35]    Although the majority recognized that res judicata may be overcome when "special circumstances" exist, the court rejected the notion that such circumstances exist when a prisoner raises a constitutional claim supplemented by a colorable showing of actual innocence. Instead, the majority effectively limited "special circumstances" to a list of four scenarios described in United States v. Palumbo, 608 F.2d 529 (3d Cir. 1979), none of which parallels the scenario addressed in Schlup. See Diamen, 725 A.2d at 509-10.

conviction), where no federalism issue exists. See United States v. Arcoren, No. CR 89-30049, 1999 WL 638244, at *7 (D.S.D. July 27, 1999) (applying Schlup in the context of Section 2255 motion); United States v. Roman, 938 F. Supp. 288, 292 (E.D. Pa. 1996) (same); United States v. Zorilla, 924 F. Supp. 560, 564 (S.D.N.Y. 1996) (same).

The majority also stated that "[t]here is nothing in Schlup to suggest that, on remand, the U.S. District Judge could simply rule, without new evidence relevant to the constitutional issues, that the prior decisions of the U.S. Court of Appeals were erroneous and that he was not obliged to follow them." Diamen, 725 A.2d at 512. There is no requirement in Schlup, as the D.C. court suggests, that requires the new evidence of a petitioner's innocence to be relevant to the constitutional issues. See Roman, 938 F. Supp. at 292 (stating that the new evidence of actual innocence "need not be directly related to the substantive claims the defendant is presenting because the claims themselves need not demonstrate that he is innocent"). Rather, Schlup requires merely that the prisoner have both a colorable constitutional claim and a colorable claim of actual innocence.[36] Furthermore, contrary to the majority's misreading of the case, Schlup

---

[36]    Moreover, the new evidence in this case is relevant to Petitioners' constitutional claims. The new evidence graphically demonstrates the severe prejudice that resulted from both the trial court's Rule and the ineffectiveness of counsel, and shows that the prejudice was of a constitutional nature. First, the new evidence reveals the true extent and importance of the evidence that Petitioners were prohibited from presenting at trial. Jones has now admitted that he, along with three men, other than Petitioners, chased Battle down and killed him, but that Petitioners took no part in the murder; the trial court's ruling prevented Petitioners from eliciting these crucial facts from Jones or any other source at trial. Jones' confession, along with the corroborating affidavits signed by Richter, Lurz, and Grayson, and new corroborative testimony from the new witness, Gianaris, shows that the rule barred Petitioners from presenting the truth to the jury because the truth, though exculpatory to them, was harmful to their codefendant, Jones.

Second, the new evidence illuminates the weaknesses in Dorothy Willetts' testimony that were not revealed to the jury; the evidence reveals that Willetts had a reputation as a liar, that she had a motive to falsely implicate Eastridge and Sousa, and that every person whom Willetts identified as being present (except for her husband, who was not interviewed) during Eastridge and Sousa's alleged incriminating statements denied that such statements were made. In light of

39

expressly held that upon a showing of "actual innocence," a U.S. District Judge could reconsider prior decisions of a U.S. Court of Appeals. Indeed, that is precisely what happened in Schlup on remand. Thus, the D.C. Court of Appeals refusal to provide the same relief under Section 23-110 made Section 23-110 ineffective to render the relief reaffirmed by and actually provided in Schlup.

In regard to the Rule 33 issue, the D.C. court did not even mention Schlup, concluding that a Section 23-110 motion that is supplemented by newly discovered evidence of innocence must be brought within two years "even where the court is convinced that 'a *grave miscarriage of justice has taken place.*'" Diamen, 725 A.2d at 506 (quoting United States v. Kaplan, 101 F. Supp. 7, 11 (S.D.N.Y. 1951)) (emphasis added).[37] Schlup, however, clearly holds that procedural bars such as these must give way to a constitutional claim supplemented by a colorable showing of actual innocence, under the "miscarriage of justice exception."

---

the fact that, as the D.C. Superior Court acknowledged, Willetts' testimony was "extremely damaging" to Petitioners at trial, United States v. Eastridge, 110 Wash. L. Rep. 1181, 1187 (1982), the new evidence illuminates the prejudice that resulted from the inexcusable failure of Petitioners' trial counsel to discover this new evidence and use it to impeach Willetts' testimony.

Moreover, although Petitioners' challenges against the trial court's Rule were rejected on appeal, the court rejected those claims in a footnote without discussion. Sousa v. United States, 400 A.2d 1036, 1038 n.1 (D.C. 1979). One potential reason for the court's rejection of those claims is that the court concluded that the trial court's ruling was harmless error. If this is in fact what occurred — and there is no way to know that this is not what happened — then the newly discovered evidence is indisputably relevant to their constitutional claims. The newly discovered evidence reveals what the D.C. Court of Appeals could not have known on direct appeal — namely, that there is strong evidence of Petitioners' innocence, and therefore, that the trial court's ruling was not harmless.

[37]     In addition, the application of Rule 33 to Petitioners' motion was improper for reasons other than the failure to apply Schlup. See infra Part IV.C.

40

4.    The D.C. Court of Appeals' Failure To Apply the Miscarriage of Justice
Exception to Petitioners' Motion Rendered Section 23-110 Inadequate or
Ineffective.

The majority's failure to apply the miscarriage of justice exception rendered Section 23-110 inadequate and ineffective in Petitioners' case. Section 23-110 of the D.C. Code, and subsequently Sections 2254 and 2255 of Title 28 of the U.S. Code, were enacted by Congress as a three-part statutory scheme to revise the procedure by which prisoners raise collateral attacks on their convictions. The purpose of the revision was to simplify the habeas process by having collateral attacks heard in the sentencing court rather than the court in the district where the prisoner is held. See United States v. Nahodil, 36 F.3d 323, 328-29 (3d Cir. 1994). To accomplish this purpose, Congress passed Sections 2254, 2255, and 23-110 as substitutes for the writ of habeas corpus: 2254 for use by state prisoners; 2255 for federal prisoners; and 23-110 for prisoners sentenced in the District of Columbia. Because the revision was designed merely to make a procedural, rather than a substantive change to habeas corpus, the remedy available in the new provisions was intended to be "'exactly commensurate with that which had previously been available in habeas corpus.'" See Kaufman v. United States, 394 U.S. 217, 221-22 (1969) (quoting Hill v. United States, 368 U.S. 424, 427 (1962)).

It follows logically that if the remedies available in the new provisions each were designed to be commensurate with habeas corpus, then they must also have been intended to be commensurate with each other. The Supreme Court has held that this is indeed the case. See Swain v. Pressley, 430 U.S. 372, 381-82 (1977) (concluding that the scope of the remedy provided by Section 23-110 is the same as that provided by Section 2255 and habeas corpus); Davis v. United States, 417 U.S. 333, 343-44 (1974) ("[H]istory makes clear that § 2255 was intended to afford federal prisoners a remedy identical in scope to federal habeas corpus. . . . [And] there can be no doubt that the grounds for relief under § 2255 are equivalent to those

41

encompassed by § 2254 . . . ."); see also Zambrana v. United States, 790 F. Supp. 838, 844 n.2 (N.D. Ind. 1992) ("It is well settled that § 2254 and § 2255 are essentially co-extensive.") (citation omitted).

The Supreme Court has specifically concluded that the adequacy or effectiveness of Section 23-110 depends on whether its remedy is, in fact, commensurate with these parallel provisions. In Swain, the Court addressed the question whether Section 23-110 was per se inadequate or ineffective. The Court concluded that it was not, reasoning that Section 2255 provides a remedy commensurate with habeas corpus, and the remedy available in Section 23-110 is co-extensive with that available in Section 2255. On this basis, the Court concluded that Section 23-110 was neither inadequate nor ineffective per se. See 430 U.S. at 381-84.

In Petitioners' case, however, the D.C. Court of Appeals rendered Section 23-110 inadequate or ineffective by making Section 23-110 no longer commensurate with Sections 2254 and 2255 with regard to the miscarriage of justice exception mandated by Schlup. If Petitioners' claims had been heard in federal court, pursuant to either Section 2254 or Section 2255, the miscarriage of justice exception would have been applied to their motion, and their claims would have been entertained on the merits. The D.C. Court of Appeals, in contrast, procedurally barred Petitioners' claims. As applied by the D.C. court, the remedy available in Section 23-110 was no longer commensurate with that provided by Sections 2254 and 2255, and it therefore was inadequate or ineffective to test the legality of Petitioners' detentions. In her dissent from the majority's opinion, Judge Ruiz reached the same conclusion, stating that the majority's decision rendered the "habeas recourse under § 23-110 'inadequate' and 'ineffective,'" and "we should construe the scope of collateral relief in our courts to be 'adequate and effective,' that is, at a minimum coextensive with the right to habeas relief in the federal courts." Diamen, 725 A.2d at

42

516, 527 (Ruiz, J., dissenting) (citations omitted). Because Section 23-110 was inadequate or ineffective, the D.C. courts do not have exclusive jurisdiction over the Petitioners' claims, which may therefore be heard by this court.

B.    The Majority Rendered Section 23-110 Inadequate and Ineffective by Mischaracterizing Petitioners' 23-110 Motion as a Motion For a New Trial

The majority also rendered Section 23-110 inadequate or ineffective by refusing to hear Petitioners' motion under that section and instead mischaracterizing Petitioners' 23-110 motion as a Motion for a New Trial Pursuant to Rule 33 of the Superior Court's Rules of Criminal Procedure. Because Rule 33 provides that a "'motion for a new trial based on the ground of newly discovered evidence may be made only before or within 2 years after final judgment'," the court held that Petitioners' motion was time-barred. See id., at 506 (quoting Rule 33). Thus, the court effectively prevented Petitioners from testing the legality of their detention.

As explained above, under Section 23-110, a prisoner may move to vacate, set aside, or correct his sentence "at any time" if it was "imposed in violation of the Constitution of the United States or the laws of the District of Columbia." D.C. Code Ann. § 23-110(a), (b). Petitioners properly moved to vacate their sentences under this section based on several independent constitutional claims.[38] The majority, however, incorrectly treated Petitioners' post-trial motion as if it was based exclusively on new evidence and ignored "the constitutional claims at the core of their arguments." Diamen, 725 A.2d at 515 (Ruiz, J., dissenting). In doing so, the majority incorrectly relied on Herrera v. Collins, 506 U.S. 390 (1993). Herrera collaterally attacked his conviction solely on the ground that newly discovered evidence

---

[38]    See infra Parts V-VII. Among these claims, for example, the Petitioners argued that the trial court's rule prohibiting testimony that might implicate their codefendants denied the Petitioners their Sixth Amendment right to effective assistance of counsel and their Fifth Amendment right to confront and cross-examine witnesses.

demonstrated that he was innocent of the crime for which he was convicted. Unlike Petitioners, Herrera did not raise any independent constitutional claims supported by assertions of actual innocence. Because Petitioners "claim that their trial was constitutionally flawed, the Herrera standard is inapplicable." Diamen, 725 A.2d at 515 (Ruiz, J., dissenting) (citing United States v. Dale, 140 F.3d 1054, 1056 (D.C. Cir. 1998), Carriger v. Stewart, 132 F.3d 463, 478 (9th Cir. 1997), and Burks v. Dubois, 55 F.3d 712, 717 (1st Cir. 1995), among other cases).

Rule 33 of the Superior Court's Rules of Criminal Procedure "is identical to the corresponding Federal Rule of Criminal Procedure." Williams v. United States, 374 A.2d 885, 889 n.6 (D.C. 1977). It therefore should be construed consistently with the federal rule. See Waldron v. United States, 370 A.2d 1372, 1373 (D.C. 1977). It is clear that under the federal Rule 33, the "purpose of granting a new trial on the basis of newly discovered evidence is not to correct a legal error, but to rectify an injustice." United States v. DeCarlo, 848 F. Supp. 354, 357 (E.D.N.Y. 1994) (quoting Guinan v. United States, 6 F.3d 468, 470-71 (7th Cir. 1993). It is also clear that when a conviction results from constitutional error, a motion is properly brought under Section 2255. See id.; see also Guinan, 6 F.3d at 470-71. While Petitioners have substantial new evidence that they were convicted of a crime they did not commit, their 23-110 motion was centered on constitutional claims that are enhanced by an assertion of factual innocence. Thus, if they were federal prisoners, Petitioners' case would properly have been brought under Section 2255. Therefore, Petitioners properly brought their motion under Section 23-110 and the majority should not have applied Rule 33 to avoid addressing their constitutional claims on the merits. Thus, the majority erroneously applied the time limitation of Rule 33 to Petitioners' 23-110 motion and rendered Section 23-110 in adequate or ineffective to test the legality of their

44

detention. This court therefore has jurisdiction to hear Petitioners' substantive claims under 28 U.S.C. § 2241.

V.   THE COURT'S RULE PROHIBITING DEFENDANTS FROM ELICITING TESTIMONY THAT MIGHT IMPLICATE THEIR CODEFENDANTS VIOLATED PETITIONERS' FIFTH AND SIXTH AMENDMENT RIGHTS

Petitioners' convictions and sentences were unconstitutional because at their trial, their counsel were barred from making arguments or introducing evidence through direct or cross-examination that might — in the trial judge's words — "bring into play any other defendant." Voir Dire Tr. at 150 (regarding oral argument); accord Tr. at 601 (regarding testimony). Under the court's rule, no attorney was to question any witness about matters involving any defendant other than his own client unless he first obtained permission from the counsel for that codefendant. As Judge Moultrie stated at one juncture, "no lawyer was to ask any questions that would inculpate or exculpate any other defendant unless he cleared it with the defense attorney." Tr. at 601. This limitation violated Petitioners' rights under the Sixth Amendment to confront and cross-examine witnesses against them and to have independent and effective counsel. Furthermore, the limitation violated the Due Process Clause of the Fifth Amendment by restricting Petitioners' ability to introduce evidence of their innocence.[39] The egregious violation of Petitioners' constitutional rights warrants vacating their convictions.[40]

---

[39]   Petitioners alternatively move for vacation of their convictions on the basis of the trial court's failure to sever their trials from that of codefendant Stephen Jones. See United States v. Gambrill, 449 F.2d 1148, 1163 (D.C. Cir. 1971) ("the difference in the amount of evidence against each defendant, when considered in light of the other elements present in the case, is a factor which supports our conclusion that . . . severance should be granted"); United States v. Leonard, 494 F.2d 955, 966 (D.C. Cir. 1974); United States v. Bolden, 514 F.2d 1301, 1310 (D.C. Cir. 1975) (severance is proper when the evidence against one defendant is far more damaging than the evidence against the other).

[40]   The unconstitutionality of the Rule was raised by counsel on direct appeal, but was not expressly addressed by the court. No court has yet explained how a rule that so severely limited

45

A.      The Court's Rule Impermissibly Limited Petitioners' Right to Confront and
        Cross-Examine Witnesses

The Sixth Amendment establishes the right of criminal defendants to confront and cross-examine all government witnesses against them.  See Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986).  The Sixth Amendment also establishes "the right to present evidence that someone else committed the offense for which [he] is on trial."  Grayton v. United States, 745 A.2d 274, 281 (D.C. 2000) (quoting Elliott v. United States, 633 A.2d 27, 32 (D.C. 1993)).  The Fifth Amendment similarly protects the right to present "evidence that someone other than [themselves] committed the charged crimes . . . through the testimony of defense witnesses and by cross-examination."  Johnson v. United States, 552 A.2d 513, 516 (D.C. 1989) (citations omitted).[41]  The trial court's rule improperly abridged both the right to present evidence and the right to cross-examine.  The injustice of this ruling is particularly clear in the instant case.  Perhaps the most poignant examples of the trial court's Rule infringing Petitioners' Fifth and Sixth Amendment rights were the aborted cross-examinations of Pamela Heim and Dorothy Willetts.[42]

Heim was a government witness who observed both the shooting of Bruce Hunter and the subsequent chase of Johnnie Battle.  She had been driven to the Godfather in codefendant

---

a defendant's ability to cross-examine witnesses or otherwise introduce evidence of or raise defenses regarding his or her innocence could possibly be constitutional.

[41]     The only restriction on such cross-examination is that the evidence elicited must be reliable and "'clearly link that other person to the commission of the crime'."  Johnson, 552 A.2d at 516 (quoting Brown v. United States, 409 A.2d 1093, 1097 (D.C. 1979)).

[42]     Throughout the trial, the court had a responsibility to assure that the degree of cross-examination permitted was commensurate with the witness' importance to the trial itself.  The D.C. Court of Appeals has recognized that "curtailment of cross-examination is rendered more severe" when a key government witness is involved and that under such circumstances "extensive cross-examination . . . [is] required to satisfy the confrontation guarantee."  Lawrence v. United States, 482 A.2d 374, 377 (D.C. 1984).

46

Richter's car and apparently had been codefendant Jones' date. Heim was the only eyewitness who testified at trial and who had identified Jones as one of the chasers before the grand jury. At trial, however, the government failed to elicit this testimony. Given the importance of this testimony to the trial, defense counsel should have been permitted to liberally cross-examine her. Instead, defense counsel were prohibited from questioning her regarding the identity of the chasers.

Defense counsel intended to cross-examine Heim on both the number of men and the names of the individuals she witnessed chasing the decedent. Sousa's counsel, Leroy Nesbitt, wanted to show by process of elimination that his client was not amongst the chasers. Tr. at 1807. Heim had testified on direct examination that she did not see the chase, whereas during her grand jury testimony she had stated unequivocally that she had seen codefendant Jones chasing Battle. Tr. at 1757-58, 1810 (grand jury testimony read to court outside the presence of the jury). Defense counsel Nesbitt wanted to show that his client, Sousa, was innocent because he had not been named in Heim's grand jury testimony, whereas codefendant Jones had been. The trial judge, over counsel's strong objection, curtailed Nesbitt's cross-examination on this point and refused to allow him to elicit from Heim, Jones' participation in the chase. Tr. at 1807, 1811.

At sidebar, the trial court specifically denied Nesbitt's request to have the witness enumerate and identify the individuals she saw giving chase. Tr. at 1807-08. Nesbitt identified at least 17 different issues on which he wished to question Heim, but was rebuffed by the court

in each instance.[43]  After a bench conference covering 24 pages of trial testimony, Pamela Heim

was dismissed with not one single word of cross-examination directed toward her.[44]

The Rule further limited cross-examination by preventing defense counsel from even

mentioning the names of codefendants in order to challenge the testimony of prosecution witness

Dorothy Willetts.  Willetts testified that she took part in several conversations with Eastridge and

Sousa wherein both men allegedly bragged about killing Battle.  When Nesbitt tried to cross-

examine Willetts about specific conversations as they related to both Sousa and Eastridge, he

was prohibited from doing so solely because this line of cross-examination would involve

references to Eastridge.  Nesbitt voiced his protest to the court's ruling in the following colloquy:

> Mr. NESBITT:  Your Honor, under the circumstances of your ruling, I
> move for a mistrial on the basis that the Government has been able to
> select from these statements and to put before these jurors inculpatory
> information about my client.  And because of the joinder of these
> defendants, I am unable to cross examine these witnesses to clarify and
> show exculpatory information as it relates to my client.
>
> Therefore, we are joined in the manner in which my client cannot receive
> a fair trial, and I move for a severance . . . .  I am confounded by reason of
> the fact that I cannot lay out the full fabric of the situation to the jury; not
> because it does not exist, not because there is not evidence to show that it
> does exist, but simply and completely because another defendant stands in
> the way of my client laying out these facts.  And that utterly confuses me
> in the presentation of his defense, Your Honor.

Tr. at 1691-92 (emphasis added).

---

[43]    Among other things, counsel wanted to question Heim about the conversation she had
overheard, on the night of the stabbing, between Jennings and Barber who had fled from the
Godfather to Richter's house on foot.  The court curtailed this avenue of inquiry because it
involved references to codefendant Richter.

[44]    Upon encountering the stumbling blocks created by the Rule, Nesbitt specifically asked
the court to be permitted to examine Heim "as though there were no co-defendants." Tr. at 1812.
The court refused.  Nesbitt further observed:  "my client cannot adequately apply his own
defense because of the prohibitions counsel have about letting me go into questions involving
their clients." Tr. at 1820.

Willetts, too, was dismissed without a word of cross-examination from any defense counsel.[45] As Judge Moultrie summarized in his opinion on Petitioner Eastridge's previous 23-110 motion alleging ineffective assistance of counsel:

> The second reason for ruling the cross-examination does not reach the level of gross incompetence pertains to the court's severe restriction regarding cross-examination at the trial. In an effort to prevent prejudice to the four codefendants, the court ruled prior to trial that no defense counsel could cross-examine a witness so as to inculpate or exculpate any other defendant unless the cross-examination was cleared first with that defendant's counsel. See Trial Transcript, pages 601, 1799, 1802, 2276-77.
>
> In fairness to trial counsel, this ruling made it very difficult to cross-examine Mrs. Willetts on this incident without further implicating codefendant Sousa in the crime. Indeed, the rule proved so restrictive to Sousa's attorney that he did not even attempt any cross-examination of a witness whose sworn testimony was very damaging to his client. (Trial Transcript, page 1691).

United States v. Eastridge, 110 Wash. L. Rep. 1181, 1187 (1982).

By limiting cross-examination, the Rule also prevented Petitioners from bolstering their claims of innocence by pointing to the comparatively weak evidence against them when compared to that against codefendant Jones. Reliable evidence, closely linking codefendant Jones to commission of the crime included the blood evidence and the grand jury testimony of Pamela Heim. Tr. at 590, 1810. There was no such physical evidence or eyewitness testimony linking any of the Petitioners to the crime. Nevertheless, in instances when this testimony about Jones was elicited, defense counsel for Petitioners were barred from cross-examining on those issues and were not permitted to contrast the evidence pointing to Jones with the dearth of

---

[45]    Defense counsels' failure to cross-examine Willetts on matters not foreclosed by the court's Rule constituted ineffective assistance of counsel under the two-part test of Strickland v. Washington, 466 U.S. 668 (1984). See infra Part VII.A.

evidence pointing to Petitioners.[46] Jones offered incredible testimony at trial (in light of his blood-soaked state at the time of arrest) that he only observed the murder from afar. The other defendants' counsel were barred from distancing their clients from this testimony on cross-examination. Jones' recent confession and recantation further emphasizes the prejudice caused by barring any meaningful cross-examination of him at trial.

In addition to abridging Petitioners' Sixth Amendment right to cross-examine witnesses,[47] the rule denied Petitioners their right under the Due Process clause of the Fifth Amendment to present "relevant and competent" testimony of their innocence. See, e.g., Zafiro v. United States, 506 U.S. 534, 540 (1993). Because the Rule, apparently, was invoked solely to accommodate a joint trial and to permit the court greater ease in administering the trial, the court should have repealed the rule once it became clear that Petitioners' trial rights were being severely impeded. Petitioners' Sixth Amendment right to confront and cross-examine witnesses, and their Fifth Amendment due process right to present evidence of their innocence, should not have been curtailed simply for the court's convenience.

---

[46]    Petitioners were also barred from bringing forth evidence that other members of the Richter party may have been the actual murderers. Defense counsel Nesbitt specifically requested the court's permission to cross-examine Pamela Heim about inculpatory admissions she had overheard from certain members of the group (i.e., Jennings and Barber) who had fled the Godfather the night of the stabbing and who had returned to Richter's house on foot. Tr. at 1804. The court refused to let him pursue this line of inquiry.

[47]    Several cases have affirmed the primacy of a criminal defendant's Sixth Amendment right to confront witnesses over competing government interests. Roviaro v. United States, 353 U.S. 53 (1957), discussed the government's right to preserve the secrecy of an informer's identity; Davis v. Alaska, 415 U.S. 308 (1974), discussed the state's interest in preserving the confidentiality of a juvenile witness' criminal record; lastly, Chambers v. Mississippi, 410 U.S. 284 (1972) discussed a state's "voucher" rule preventing a criminal defendant from impeaching his own witness. In each of these cases the court permitted the criminal defendant to go forward with his cross-examination strategy despite the conflicting governmental policies.

B.    The Court's Rule Denied Petitioners' Sixth Amendment Right to Effective Assistance of Counsel

The court's Rule also prevented defense counsel from being zealous and single-minded advocates on behalf of their respective clients, and thereby deprived Petitioners of effective assistance of counsel in violation of the Sixth Amendment.

The Sixth Amendment guarantees a criminal defendant the right to "the benefit of the undivided assistance of his counsel without the court's becoming a party to encumbering that assistance," Glasser v. United States, 315 U.S. 60, 76 (1942). Thus, "state interference with counsel's assistance" is tantamount to "constructive denial of the assistance of counsel" and is "legally presumed to result in prejudice" to the defendant. Strickland v. Washington, 466 U.S. 668, 692 (1984). Moreover, "[g]overnment violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense." Id. at 686.[48]

The trial record is rife with instances in which the rule limited Petitioners' defenses, and thus constructively denied them effective assistance of counsel.[49] The Rule clearly denied Petitioners the opportunity to raise a blame-shifting defense that would have distanced them from the strong evidence of codefendant Jones' guilt. The Rule thus was at odds with the

---

[48]    The D.C. Court of Appeals has long held: "The first essential element of effective assistance of counsel is counsel's ability and willingness 'to advocate fearlessly and effectively' on behalf of his client." Douglas v. United States, 488 A.2d 121, 135 (D.C. 1985) (emphasis added) (internal quotations and citation omitted). See also Strickland, 466 U.S. at 691.

[49]    In addition to the examples cited supra Part V.A., at the beginning of the trial, defense counsel Nesbitt for Petitioner Sousa stated:

> [S]hould I be required to go forward with co-counsel in case, it will be necessary in the presentation of the defense of my client to substantially assist the Government in making the conviction of a codefendant — of at least a codefendant in this case, in my case in chief.

Transcript of December 29, 1975 bench conference at 4 (emphasis added).

51

admonition of the D.C. Court of Appeals that "a strategy of shifting blame to one's codefendants is a legitimate and often effective defense strategy," and an "extremely feasible and useful" defense. Fitzgerald v. United States, 530 A.2d 1129, 1139-40 (D.C. 1987) (intended quotations and citation omitted).[50]

The trial record reveals that the Rule was invoked, quite effectively, to curtail a blame-shifting trial strategy proposed by defense counsel Nesbitt. The following exchange illustrates the continuing attempt to present such defense:

> MR. NESBITT: Your Honor, is it necessary, with that ruling, to go through this transcript?
>
> This transcript, in several instances, points the finger elsewhere other than at my client.
>
> And I believe that a good defense in the case for my client, Mr. Sousa, or for any client I have, is that my client could not possibly have done it because somebody else did it.
>
> THE COURT: Does it point a finger at who did it?
>
> MR. NESBITT: Yes, Your Honor, it does. I can't bring that out at this time because of the Court's ruling.

Tr. at 1802 (emphasis added).

In this case, a blame-shifting defense would have been a realistic, feasible and highly effective defense strategy. The three Petitioners, despite being charged with participating in a bloody stabbing, were completely free of the victim's blood. None of them were specifically identified as among the chasers. On the other hand, Defendant Jones was covered in the victim's

---

[50]   See also United States v. Wilson, 434 F.2d 494 (D.C. Cir. 1970) (codefendant's motion to sever, predicated on his fear that co-indictees would offer their exculpatory statements which would tend to shift blame to him, was denied); Christian v. United States, 394 A.2d 1 (D.C. 1978) (codefendant was permitted to present antagonistic defense which argued the weakness of the case against him by comparing it to the strength of the case against his codefendants). In both of these cases, defendants were permitted to present evidence in their defense that implicated their codefendants.

blood, and had been specifically identified by Pamela Heim as one of the chasers. Thus, Petitioners were prevented from arguing that, given the physical and testimonial evidence, (i) they were not among the chasers even if Jones was, (ii) they did not participate in the murder even if Jones did, and (iii) they picked up the bloodsoaked Jones in the car after Jones fled the scene of the crime.[51] Since the jury was prevented from hearing evidence which would have distanced the Petitioners from Jones, the jury was more likely to conclude that Petitioners, who were arrested in the same car with the blood-soaked Jones, were also guilty.

The Rule denied Petitioners' counsel the opportunity to present exculpatory evidence and limited the "wide latitude counsel must have in making tactical decisions" about their clients' defense. Strickland, 466 U.S. at 689. By intruding upon counsels' independent judgment and by

---

[51]    Counsel attempted to, and was prevented from presenting this theory to the jury:

> MR. NESBITT: .. . Did I understand your Honor's ruling that I cannot in the course of cross-examination deal with the subject of blood as it was shown on another person other than my client?
>
> THE COURT: That's right.
>
> * * * *
>
> MR. NESBITT: And that my client in this case is alleged to have two drops of blood on the shirt he was wearing that could not be typed, and that the car that my client was in was examined and found to have had blood on it.
>
> By my not being able to examine this area, I do not see how I can effectively represent my client's possible explanation of the presence of blood on him.
>
> It could very well have come from the hands of a co-defendant to this incident or could have been picked up from the seat of the car prior to this incident.
>
> By this stage, I am estopped from effectively representing him on the accusatory nature of blood on his clothes.

Tr. at 1815-16.

foreclosing a blame-shifting defense strategy, the Rule unconstitutionally limited Petitioners' right to effective counsel in violation of the Sixth Amendment.

VI.    THE PROSECUTION'S USE OF PEREMPTORY CHALLENGES TO EXCLUDE WHITE JURORS FROM THE JURY VIOLATED PETITIONERS' FIFTH AMENDMENT RIGHT TO DUE PROCESS

In Batson v. Kentucky, 476 U.S. 79 (1986), the Supreme Court held that, in the absence of a rebutting explanation by the prosecution, a court may infer a violation of the defendant's constitutional rights from the prosecutor's exercise of peremptory challenges to exclude persons of the defendant's race from the jury. Id. at 96-98. While Batson involved a state court conviction and was decided under the Equal Protection Clause of the Fourteenth Amendment, its analysis is equally applicable to Petitioners' rights in this case under the Due Process Clause of the Fifth Amendment. See Tursio v. United States, 634 A.2d 1205, 1213 (D.C. 1993) (applying Batson); Bolling v. Sharpe, 347 U.S. 497, 499 (1954).

> To establish a Batson claim:
>
> [T]he defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude veniremen from the petit jury on account of their race.

Batson, 476 U.S. at 96 (citations omitted).

Petitioners are white.  The deceased was black.  At trial, all the jurors were black.[52]

During selection of the jury, the prosecution used peremptory challenges to exclude each white

person who otherwise would have been included in the jury.[53]  Moreover, Petitioners' case

involved an interracial murder, and racially derogatory statements attributed to the Petitioners

and their group were part of the government's evidence.  In these circumstances, the

government's use of peremptory challenges to exclude all white jurors from the panel was

improper.[54]

As a general rule, Batson does not apply retroactively to a petitioner whose conviction

became final before Batson was decided.  Allen v. Hardy, 478 U.S. 255, 257-58 (1986); see

Teague v. Lane, 489 U.S. 288 (1989).  However, the unusual facts of this case warrant a new

trial although Batson was not decided until after Petitioners' direct appeals were exhausted.

---

[52]    Third Affidavit of Salvatore M. Infantolino a/k/a Michael A. Diamen (Exhibit 25); Affidavit of Joseph Nick Sousa ¶ 2 ("Sousa Aff.") (Exhibit 27); Affidavit of Joseph Wayne Eastridge ¶ 2 ("Eastridge Aff.") (Exhibit 28).  The government did not contest Diamen's 1985 assertion that prosecutors used peremptory challenges to exclude white jurors.  Brief for Appellee, Diamen v. United States, Cr. No. 84-1358, at 11 (D.C. Apr. 4, 1985).

[53]    Id.

[54]    It would have been pointless for counsel for Petitioners to object during trial to the prosecution's use of peremptory challenges in this manner because the now-overruled decision of Swain v. Alabama, 380 U.S. 202, 222-28 (1965), which had required a defendant to show a pattern of like exercise of peremptory challenges in other cases, was the governing rule at the time.  Thus, the lack of objection was not a waiver.  As the D.C. Court of Appeals has recognized, "a strong presumption exists against waiver of a constitutional right."  Turner v. United States, 459 A.2d 1054, 1056 (D.C. 1983); accord Johnson v. Zerbst, 304 U.S. 458, 464 (1938).  Waiver of a constitutional right requires the "intentional relinquishment or abandonment of a known right or privilege."  Zerbst, 304 U.S. at 464.  Since Batson had not been decided, Petitioners and their counsel could not know of the right or privilege that Batson announced; they should not be punished for failing to make a futile objection under the prior rule of Swain v. Alabama, 380 U.S. 202 (1965); cf. Turner, 459 A.2d at 1056 ("Whether an effective waiver . . . has occurred depends on all circumstances of the case.") (citation omitted).  Moreover, even if Petitioners were construed to have waived their claim under Batson, their actual innocence negates the effect of any such procedural default.  See, e.g., Murray v. Carrier, 477 U.S. 478, 496 (1986).

Supreme Court jurisprudence on retroactive application of new constitutional rules recognizes that retroactivity is appropriate where the new rule (1) goes to the fundamental fairness of the proceeding and (2) "significantly improve[s] the pre-existing fact-finding procedures that are to be retroactively applied on habeas." Sawyer v. Smith, 497 U.S. 227, 242 (1990) (quoting Desist v. United States, 394 U.S. 244, 262 (1969) (Harlan, J., dissenting)). Teague and Allen, the two Supreme Court cases denying retroactive application of Batson, concerned cases where the defendants' guilt was not an issue and where the trials had not involved interracial crimes. In those circumstances, the Court concluded that a racially balanced jury was not an "absolute prerequisite to fundamental fairness" justifying retroactive application. Teague, 489 U.S. at 314.

By contrast, the prosecution's use of peremptory challenges to exclude all whites from the jury goes to the fundamental fairness of the proceeding on the unusual facts of Petitioners' case. The jury was not merely of a different race than Petitioners and the same race as the victim; the crime itself was portrayed as inherently racial in nature. Sousa was depicted by Willetts as routinely using the word "nigger" in his purported statements regarding Battle. Tr. at 1662 ("'killing a nigger in D.C.'"); Tr. at 1663 ("it was a nigger that got Kenny"); Tr. at 1668 ("cut her like he did that nigger in D.C."). As part of the group with which they went to the Godfather, Petitioners were described as calling "black dudes 'niggers,' and stuff like that." Tr. at 1177 (testimony of David Brady); see also Tr. at 1823 (testimony of Stephen Maday) (referring to a big man yelling obscenities to a black male); Tr. at 1753 (testimony of Pamela Heim) (referring to Jones stating "'[m]onkeys don't like popcorn?'").[55]

---

[55]    The Washington press similarly adopted a racial angle in covering the case, emphasizing the fact that the males in Petitioners' group were members of a white motorcycle club. Jane Rippeteau & Deborah Sue Yaeger, Man Stabbed to Death, 4 Charged With Homicide, Wash.

56

The exclusion of white jurors in this case was, therefore, "a procedure which create[d] an impermissibly large risk that the innocent will be convicted . . ." Teague, 489 U.S. at 312 (quoting Desist, 394 U.S. at 262 (Harlan, J., dissenting)); Sawyer v. Butler, 881 F.2d 1273, 1288 (5th Cir. 1989) ("neither finality nor federalism will condone constitutional acquiescence in the conviction of persons factually innocent of the crime charged"), aff'd sub nom. Sawyer v. Smith, 497 U.S. 227 (1990); see also John C. Jeffries, Jr. & William J. Stuntz, Ineffective Assistance and Procedural Default in Federal Habeas Corpus, 57 U. Chi. L. Rev. 679, 718 (1990) (suggesting courts should "look at the record to see whether the case was close" and apply new rules retroactively if it was). Accordingly, under the unique facts of this case, Batson should be applied retroactively to require a new trial.

## VII. THE PETITIONERS WERE DEPRIVED OF THEIR SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL

Under the two-part test of Strickland v. Washington, 466 U.S. 668 (1984), Petitioners' convictions should be reversed if (1) counsel's performance was "deficient" and (2) the deficient performance "prejudiced the defense" in a manner sufficiently serious as to deprive the defendant of a trial "whose result is reliable." Id. at 687; see also Payne v. United States, 697 A.2d 1229, 1232 (D.C. 1997) (quoting Zanders v. United States, 678 A.2d 556, 569 (D.C. 1996)).[56] In addition to the trial court's Rule barring counsel from eliciting inculpatory evidence

---

Post, Nov. 3, 1974, at B1; Allan Frank, 1 Killed, 1 Hurt in Street Fight, Wash. Star, Nov. 3, 1974, at B2; Stephen Green, 4 Pagans Guilty in Man's Murder, Wash. Post, Jan. 7, 1976, at B1; Kenneth Walker, Pagans Found Guilty of '74 Racial Slaying, Wash. Star, Jan. 7, 1976, at B3. The Washington Post headlined Mr. Battle's murder as coming out of a "Race Row," Wash. Post, Nov. 3, 1974, at B1, and the Washington Star called it a "racially motivated fight," Wash. Star, Nov. 3, 1974, at B2.

[56]     At the time of the trial, the test for whether a defendant's Sixth Amendment right to counsel had been infringed was whether "there [was] gross incompetence of counsel and that this . . . in effect blotted out the essence of a substantial defense . . . ." Bruce v. United States, 379

and making argument regarding other codefendants, which rendered defense counsel unable to provide effective assistance of counsel (see supra Part V), defense counsel were ineffective in at least two additional respects.

### A.    Petitioners' Counsel All Failed Effectively To Impeach Dorothy Willetts

Leroy Nesbitt, counsel for Sousa, O.B. Parker, counsel for Eastridge, and John E. Kilcarr, counsel for Diamen, each committed prejudicial error and failed to pursue effective defenses that would have proven their clients' innocence. The most critical of these failures was their failure to take readily available and effective steps to impeach Willetts, who testified that Eastridge and Sousa had implicated themselves in the murder of Battle.

Willetts' testimony — that Eastridge and Sousa repeatedly bragged about Battle's murder — constituted the only direct evidence at trial linking Eastridge and Sousa to Battle's murder. As such, the veracity of her statements was crucial to the prosecution's case. Willetts' testimony prejudiced Diamen as well, considering that the government presented no direct evidence at trial of his involvement in the murder. At the time of trial, it was evident that if the jury chose to believe Willetts (and find Eastridge and Sousa guilty of Battle's murder), they would likely find Diamen guilty by association. Given the utter lack of other evidence of guilt, Petitioners would not have been convicted had Willetts' testimony been properly impeached.

Under the Sixth Amendment, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. In particular, the D.C. Court of Appeals has made clear that trial counsel has an

---

F.2d 113, 116-17 (D.C. Cir. 1967) (quoted in Woody v. United States, 369 A.2d 592, 593-94 (D.C. 1977)); accord Angarano v. United States, 312 A.2d 295, 300 (D.C. 1973). The D.C. Court of Appeals has treated this test as essentially the same as the test subsequently adopted by the Supreme Court in Strickland. See Curry v. United States, 498 A.2d 534, 539-40 (D.C. 1985).

58

"obligation" to determine the availability and testimony of witnesses regarding important facets of the case. Curry, 498 A.2d at 544 (obligation of counsel to interview character witnesses where credibility is a key issue); accord Miller v. United States, 479 A.2d 862, 870 (D.C. 1984) ("Counsel has an obligation to interview witnesses known to have knowledge of the crime with which the defendant is charged, at least where there is reason to believe the testimony will be favorable to the defense.") (citation omitted); Harris v. United States, 441 A.2d 268, 274 (D.C. 1982) ("the failure to make reasonable efforts to interview and utilize known witnesses" important to the case was ineffective assistance).

At least ten people Willetts identified would have impeached her testimony if interviewed and called to testify.[57] Petitioners' lawyers failed to interview such witnesses or to seek a continuance after Willetts' testimony to provide more time to locate and interview them. At the close of Willetts' direct testimony, Sousa and Eastridge expressed concern about her testimony and offered to find impeachment witnesses. See Sousa Aff. ¶ 5 (Exhibit 27); Eastridge Aff. ¶ 5 (Exhibit 28). Nesbitt told Sousa that Willetts' testimony had not been damaging and that he need not go to the trouble of finding impeachment witnesses. See Sousa Aff. ¶ 5 (Exhibit 27). Parker also told Eastridge not to bother. Eastridge Aff. ¶ 5 (Exhibit 28). Kilcarr also failed to make any attempt to impeach Willetts, or even to make clear to the jury that none of her testimony implicated his client. Thus, all three of Petitioners' lawyers failed "to make reasonable efforts" to uncover powerful evidence that Willetts was lying. Harris, 441 A.2d at 274.

Because Sousa and Eastridge were concerned by Willetts' testimony, they sought out witnesses anyway. At Sousa's request, Donald Lambert and Lillian Gordon came from Fredericksburg to testify on his behalf at trial. However, none of Petitioners' lawyers sought to

---

[57]   See supra Statement of Facts, Part III.

learn what testimony these persons could provide.[58] Eastridge located Mary Kerr, a/k/a "Rita Kerr" (now Mary Snyder), and convinced her to come testify at the trial. None of the Petitioners' lawyers elicited her testimony in an effective manner either.[59]

Lambert testified at trial that he had been at the Scottish Inn with Sousa shortly after the death of Battle and had seen Willetts. Tr. at 2146. Lambert said he did not see or hear any words exchanged between Sousa and Willetts and that he had never heard Sousa make any self-incriminating statements in regard to the murder of Battle. Tr. at 2147. Nesbitt, however, asked Lambert about the wrong occasion at the Scottish Inn. Nesbitt asked Lambert about a time "about a week and a half or two weeks" after the murder. Tr. at 2145. By contrast, Willetts had testified to inculpatory statements at the Scottish Inn by Sousa on November 9, 1975, over a year after the murder. Parker and Kilcarr did not question Lambert.

Gordon's only substantive testimony was that she never heard Sousa tell her he was going to cut her like he did Battle. Tr. at 2162. If asked by any of the three counsel, Gordon's

---

[58]    Before Lambert testified, he "searched out" Nesbitt during a trial recess and asked him "whether we could go over what I was going to testify about." Affidavit of Donald Lambert ¶ 6 (Exhibit 29). Lambert states, "Sousa's lawyer said we did not need to talk before I testified. Sousa's lawyer and I talked only about one minute before I testified." Id. At another recess later in the day, Lambert asked Nesbitt when he would be called to testify, "He told me that if I wanted to leave, I probably would not be needed anyway." Id. ¶ 7.

Before Gordon testified, she "did not have any discussion with Sousa's attorney" about her testimony. Gordon Aff. ¶ 11 (Exhibit 15). Gordon states, "I am uncertain as to whether I even met Sousa's attorney before he started asking me questions during my testimony. I would have made myself available to speak with Sousa's attorney prior to my testimony." Id.

[59]    Parker never spoke to Kerr before she took the witness stand to testify at the trial. Snyder Aff. ¶ 8 (Exhibit 14). Similarly, Parker spoke only briefly with another witness located by Eastridge, Thomas Calamos, for "only a minute or two" before his testimony on behalf of Mr. Eastridge. Affidavit of Thomas Calamos ¶ 7 (Exhibit 30). Calamos testified that Eastridge's nickname was not "Bloody," as Willetts had stated, but "Bloodworm," a nickname derived from a fishing trip, and that Eastridge was most often called "Wayne." Id. ¶ 5; see also Wilson Jones Aff. ¶ 12 (Exhibit 18).

testimony could have gone well beyond this simple statement.  In contrast to Willetts' testimony, Gordon would have testified that she never saw Willetts and Sousa sitting at the same table at Hornes.  Gordon Aff. ¶ 6 (Exhibit 12).  Gordon also could have testified that she never heard Sousa make any other self-incriminating statement about the murder of Battle.  Id. ¶ 8.

Kerr had been identified by Willetts as having been present when Eastridge made self-incriminating statements at the Jockey Club.  When Kerr took the witness stand and Parker asked her to state her full name for the record, she said her name was "Mary Leona Marguerete [G]oodwin[] Kerr."  Tr. at 2272.  Parker never asked Kerr if she was also known as "Rita Kerr." Thus, Parker failed to have Kerr make clear to the jury that she was a woman specifically identified by Willetts as having been present at Eastridge's alleged self-incriminating statements. Once again, Nesbitt and Kilcarr did not question her at all.

Moreover, none of Petitioners' lawyers ever asked Kerr on the stand to refute the specific statements attributed to Eastridge by Willetts.  Willetts had testified that she had heard, in Kerr's presence, the following statements by Eastridge and Sousa:

> And Wayne said to Nick, said, "You're the one that cut his nose off."
>
> And Nick said, "Well, yeah, I did that, but you sliced his ear."
>
> And Nick also said, "You shouldn't have gone so crazy."
>
> And Wayne said, "Well, I just can't help it when I get to stabbing.  I can't help it.  I can't quit.  I kept on going."

Tr. at 1662-64.  Parker established that Kerr saw Willetts and Eastridge at the bar when this conversation allegedly occurred, but he simply asked if she heard them talk to each other (Kerr said no).  Thus, Parker failed to ask Kerr to refute Willetts's specific testimony.

Furthermore, Petitioners' counsel could have impeached Willetts' testimony in several other ways:  (1) Willetts had a general reputation in her community for being untrustworthy, (2)

Willetts had a motive to gain revenge on Sousa and Eastridge, and (3) Willetts had stated shortly before going to the police that she intended to gain revenge on Eastridge.

Such evidence was readily available. First, several witnesses could have testified that Willetts had a reputation as a liar and as one who became obsessed with persons with whom she was romantically involved.[60] None of the three lawyers asked her about her romantic involvement with either Eastridge or Sousa. This information would have established a motive for her to attack both Sousa and Eastridge. Counsels' failure to elicit this information left them unable to respond to the government's argument that Willetts lacked "even a suggestion of a motive" to lie.[61]

Given the importance of Willetts' testimony and the magnitude of the foregone impeachment, the failure of all three lawyers to impeach her casts substantial doubt on the verdict. Moreover, the prejudice from this failure is multiplied by the weakness of the prosecution's other evidence. This failure by all three lawyers violated Petitioners' Sixth Amendment rights to the effective assistance of counsel and mandates a new trial.

B.    Counsel For Eastridge Also Blotted Out His "Whiskey Bottle Defense"

Defense counsel Parker also completely blotted out a powerful defense for Eastridge by failing to take advantage of Stephen Maday's testimony. Maday testified that he saw someone with a whiskey bottle "jogging" north on Wisconsin Avenue, in the opposite direction of the chase of Battle. Tr. at 1841. Maday testified specifically and without contradiction that this person (the person jogging with the whiskey bottle) was "not" one of the chasers. Tr. at 1832. The government admitted the person with the whiskey bottle was Eastridge. Tr. at 2790. This

---

[60]    See Hughes Aff. ¶ 5 (Exhibit 21); Hughes Second Aff. ¶ 6 (Exhibit 21); Coker Aff. ¶ 5 (Exhibit 20); Coker Second Aff. ¶¶ 5, 8 (Exhibit 20).

[61]    Prosecution's Rebuttal Argument, Tr. at 2788.

testimony alone should have raised a reasonable doubt as to Eastridge's alleged guilt, and therefore as to Sousa's and Diamen's guilt as well.

Parker failed to argue in closing argument that the testimony of Maday, a government witness, proved Eastridge could not have been a chaser and killer of Battle. Instead, Parker astoundingly argued that Eastridge was not the person seen by Maday, even though Maday effectively had exonerated the person carrying the whiskey bottle. Transcript of Defense Closing Argument, 6-8.

These mistakes by Parker not only deprived Eastridge of a valid defense to the charges made against him, they also enabled the government to argue that exculpatory evidence was incriminating.[62] In addition, Nesbitt and Kilcarr also failed to use this information to their clients' advantage. Thus, Petitioners were once again denied their Sixth Amendment right to effective assistance of counsel, a violation which mandates a new trial.

---

[62]    Parker's error enabled the government to create the impression that Maday's testimony incriminated Eastridge rather than exonerated him. During opening argument, one of the government prosecutors said the evidence would show that "one of the individuals chasing . . ." had a whiskey bottle. Tr. at 65. On closing argument, the other government prosecutor argued that Eastridge had admitted handling the whiskey bottle, as if that implicated rather than exculpated him, and then tied it to the government misstatement on opening argument. See Tr. at 2790 ("You remember that bottle").

## CONCLUSION

For the foregoing reasons, Petitioners submit that their peition for habeas corpus should

be granted and their convictions vacated.

Respectfully submitted,

Andrew B. Weissman, Esq. (D.C. Bar No. 245720)
Sara E. Emley, Esq. (D.C. Bar No. 444965)
Jay V. Prabhu, Esq. (D.C. Bar No. 458428)
Clifton L. Brinson, Esq. (D.C. Bar No. 465178)
David J. Aveni, Esq. (D.C. Bar No. 467346)
WILMER, CUTLER & PICKERING
2445 M Street, N.W.
Washington, D.C.  20037-1420
(202) 663-6000

Counsel for Petitioners Joseph Wayne Eastridge and
Joseph Nick Sousa

John Kenneth Zwerling, Esq. (D.C. Bar No.147637)
ZWERLING & KEMLER, P.C.
108 N. Alfred Street
Alexandria, Virginia  22314
(703) 684-8000

Counsel for Petitioner Michael A. Diamen

December 21, 2000

64

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I caused a true and correct copy of the foregoing "Petition for

Habeas Corpus" with two volumes of Exhibits, and a proposed order to be mailed this 21st day

of December, 2000, via regular mail, postage prepaid to:

> Wilma A. Lewis, Esq.
> Attn:  Mark Nagle
> United States Attorney
>     for the District of Columbia
> Judiciary Center
> 555 Fourth Street, N.W.
> Washington, D.C.  20001
> (202) 514-6600

Andrew Weissman, Esq. (D.C. Bar No. 245720)